IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| TIMOTHY T. BOYLAN, JR., Personally, and as the Administrator of the ESTATE OF LISA LYNN EDWARDS, | ) ) ) | No. |
| | ) | District Judge: |
| Plaintiff, | ) | Magistrate Judge: |
| | ) | |
| v. | ) ) | CIVIL ACTION-LAW JURY TRIAL DEMANDED |
| BRANDON D. WARDLAW, ADAM BARNETT, TIMOTHY DISTASIO, DANNY DUGAN, CITY OF KNOXVILLE, TENNESSEE, GERRID H. UTLEY, ANTHONY SMITH, CHRISTOPHER JONES, SHIELD AND BUCKLER SECURITY, INC., KELLEN T. BANNON, TEAMHEALTH, FORT SANDERS REGIONAL, and COVENANT HEALTH, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

---

## COMPLAINT WITH JURY DEMAND

---

AND NOW comes the Plaintiff, TIMOTHY T. BOYLAN, JR., Personally, and as the Administrator of the ESTATE OF LISA LYNN EDWARDS, by and through his counsel, DEVON M. JACOB, ESQUIRE, of the law firm of JACOB LITIGATION, INC., to aver the following:

### I.    JURISDICTION AND VENUE

1.    This action is brought pursuant to 42 U.S.C. § 1983.

2.    Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 1367.

1

3. Pursuant to 28 U.S.C. § 1391, venue is proper in this Court, because the Defendants are located within the Eastern District of Tennessee, and the cause of action arose in the Eastern District of Tennessee.

## II. __IDENTIFICATION OF PARTIES__

4. Plaintiff, TIMOTHY T. BOYLAN, JR. is an adult male, who during all relevant times, was a resident of Coventry, Rhode Island. BOYLAN is the biological son of Lisa Lynn Edwards. On May 3, 2023, the Probate Court of the City of Pawtucket, Rhode Island, appointed BOYLAN as the Administrator of the ESTATE OF LISA LYNN EDWARDS.

5. Defendant, BRANDON D. WARDLAW, is an adult male, who during all relevant times was employed by the Knoxville Police Department, as a sworn police officer, with the rank of sergeant. WARDLAW'S actions were taken under color of state law. He is sued in his individual capacity.

6. Defendant, ADAM BARNETT, is an adult male, who during all relevant times was employed by the Knoxville Police Department, as a sworn police officer. BARNETT'S actions were taken under color of state law. He is sued in his individual capacity.

7. Defendant, TIMOTHY DISTASIO, is an adult male, who during all relevant times was employed by the Knoxville Police Department, as a sworn police officer. DISTASIO'S actions were taken under color of state law. He is sued in his individual capacity.

8. Defendant, DANNY DUGAN, is an adult male, who during all relevant times was employed by the Knoxville Police Department, as a civilian employee, as a Transportation Officer. DUGAN'S actions were taken under color of state law. He is sued in his individual capacity.

9. Defendant, CITY OF KNOXVILLE, TENNESSEE, owns and operates the Knoxville Police Department. CITY'S principal place of business is 400 Main Street, Knoxville,

2

TN 37902. Knoxville Police Department's principal place of business is 800 Howard Baker Jr. Avenue, Knoxville, TN 3791.

10.     Defendant, GERRID H. UTLEY, is an adult male, who during all relevant times was employed by Shield and Buckler Security, Inc., as a Security Officer. UTLEY'S actions were taken under color of state law. He is sued in his individual capacity.

11.     Defendant, ANTHONY SMITH, is an adult male, who during all relevant times was employed by Shield and Buckler Security, Inc., as a Security Officer. SMITH'S actions were taken under color of state law. He is sued in his individual capacity.

12.     Defendant, CHRISTOPHER JONES, is an adult male, who during all relevant times was employed by Shield and Buckler Security, Inc., as a Security Officer. JONES' actions were taken under color of state law. He is sued in his individual capacity.

13.     Defendant, SHIELD AND BUCKLER SECURITY, INC., is a security company. SHIELD AND BUCKLER'S principal place of business is 3309 E. Governor John Sevier Highway, Suite 102, Knoxville, TN 37914.

14.     Defendant, KELLEN T. BANNON, is an adult male, who during all relevant times was employed TeamHealth MidAtlantic and affiliated with Fort Sanders Regional Medical Center, as a Doctor of Osteopathic Medicine, licensed and practicing the specialty of Emergency Medicine.

15.     Defendant, TEAMHEALTH, is one of the nation's largest providers of hospital-based clinical outsourcing in multiple departments, including Anesthesia, Hospital Medicine, in addition to Emergency Medicine. TEAMHEALTH'S principal place of business is 265 Brookview Town Ctr Way Suite 203, Knoxville, TN 37919.

3

16.     Defendant, FORT SANDERS REGIONAL, is a hospital owned and operated by Covenant Health. FORT SANDERS REGIONAL'S principal place of business is 1901 Clinch Ave, Knoxville, TN 37916.

17.     Defendant, COVENANT HEALTH, is a non-profit corporate entity that operates a health system. COVENANT HEALTH is the area's largest employer and has more than 11,000 caregivers, clinicians, employees, and volunteers. COVENANT HEALTH conducts business at nearly 150 locations, including 10 hospitals; outpatient clinics; specialized behavioral, oncology and rehabilitation facilities; home care; physician practices, and community programs. COVENANT HEALTH'S principal place of business is 244 Fort Sanders West Boulevard, Knoxville, TN 37922.

III.    **MATERIAL FACTS**

18.     On February 4, 2023, LISA LYNN EDWARDS ("EDWARDS") flew from Rhode Island to Tennessee.

19.     EDWARDS fell ill during the flight.

20.     Upon arrival at the airport, EDWARDS was transported via American Medical Response ("AMR"), 296 E. Howe Street Alcoa, TN 37701, to Blount Memorial Hospital, 907 E. Lamar Alexander Parkway, Maryville, TN 37804.

21.     EDWARDS was wheelchair bound, having been previously rendered disabled by a stroke.

22.     At around 7:45 PM, EDWARDS presented in the Blount emergency department with a chief complaint of abdominal pain.

23.     EDWARDS was treated and discharged on the same date at around 10:35 PM.

4

24.    On February 4, 2023, at around 11:57 PM, EDWARDS presented in the emergency department at COVENANT HEALTH/FORT SANDERS REGIONAL, seeking emergency medical care.

25.    Her chief complaint was again, abdominal pain.

26.    There are three physicians referenced in EDWARDS' medical records: Dr. Richard L. Welch II, DO; Dr. Shawn T. Robertson, MD; and Dr. KELLEN T. BANNON, DO ("BANNON").

27.    BANNON appears to be the physician of record who made patient contact, provided care, and documented and signed orders, including the discharge order.

28.    BANNON is a Doctor of Osteopathic Medicine licensed and practicing the specialty of Emergency Medicine in Tennessee.

29.    On February 5, 2023, at around 6:55 AM, BANNON discharged EDWARDS from the ER.

30.    BANNON should not have discharged EDWARDS at that time.

31.    EDWARDS had several vital signs that remained outside normal values.

32.    Her tachycardia had worsened during her stay from 110 bpm to 117 bpm.

33.    Notably, on admission to Blount Memorial Hospital, her heart rate was 64 bpm, and at discharge from Blount, her heart rate was 78 bpm.

34.    EDWARDS had three out of four Systemic Inflammatory Response Syndrome ("SIRS") criteria.

35.    While there was no clear source of infection, it was a warning of a serious medical condition.

5

36.    EDWARDS had an unclear negative change in her mental status that had not been evaluated but instead was ignored.

37.    EDWARDS' vitals - persistent tachycardia (108-121 bpm), tachypnea 17-28 rpm, and hypoxia 91-93% - suggest she may have been experiencing a mild COPD exacerbation that she could have recovered from had she received proper medical care prior to discharge.

38.    In fact, the post discharge video shows EDWARDS suffering from moderate to severe COPD exacerbation.

39.    EDWARDS respiratory distress increased, with an increased work of breathing, prolonged respiratory phase, audible wheezing, and speaking in 3–5-word sentences.

40.    EDWARDS' worsening tachycardia, unstable vital signs, and negative change in mental status, were clear warning signs of a more severe underlying emergency medical condition.

41.    This is supported by the fact that EDWARDS suffered a cardiac arrest approximately 2 hours and 20 minutes after discharge.

42.    It was documented that shared decision making took place between EDWARDS and BANNON, that the risk and benefits of her treatment options were discussed, and that "we" have agreed on a treatment plan and disposition.

43.    However, it is undisputed that there was no agreement on a treatment plan and disposition, as EDWARDS did not willingly leave the hospital.

44.    Rather, it is undisputed that EDWARDS was discharged over her objection, rolled into the waiting room, rolled by hospital security guards into the freezing cold wearing only paper scrubs, placed under physical arrest, and forcibly removed by police officers from the hospital property.

6

45.     At the time when EDWARDS was discharged, the temperature outside was 29 degrees.[1]

46.     COVENANT HEALTH/FORT SANDERS REGIONAL has a security team that it employs who recommend and implement security policies and supervise security guards.

47.     The security guards who work for COVENANT HEALTH/FORT SANDERS REGIONAL are employed by SHIELD AND BUCKLER SECURITY, INC. ("SHIELDS AND BUCKLER").

48.     The nature of the relationship between COVENANT HEALTH/FORT SANDERS REGIONAL and SHIELDS AND BUCKLER constitutes dual employment of the security guards.

49.     It is believed that the following SHIELDS AND BUCKLER employees were involved in the incident: GERRID H. UTLEY, ANTHONY SMITH, and CHRISTOPHER JONES (collectively, SECURITY GUARDS").

50.     EDWARDS was wheeled to the entrance to the hospital's parking lot along with her belongings and instructed to leave the premises.

51.     When EDWARDS again refused to leave (because she physically could not leave, had nowhere to go, and was still suffering from a medical emergency), hospital security called 911 and requested a police response.

52.     UTLEY called 911 and requested a police response from the Knoxville Police Department.

53.     UTLEY referred to EDWARDS as a "trespasser" and advised 911 that "she's gonna need to be removed."

---

[1] https://www.wunderground.com/history/daily/KTYS/date/2023-2-5

54.     It is believed that the following Knoxville police officers were involved in the incident: BRANDON WARDLAW, Sergeant; ADAM BARNETT; TIMOTHY DISTASIO; along with Knoxville civilian employee, DANNY DUGAN, Transportation Officer (collectively, "KNOXVILLE OFFICERS").

55.     Video of the incident that occurred on hospital property or within a few feet of same, reveals that for approximately one hour, EDWARDS was verbally abused and manhandled by the involved SECURITY GUARDS and KNOXVILLE OFFICERS.

56.     In response to UTLEY'S call, WARDLAW arrived on scene first in full uniform and a marked patrol vehicle.

57.     WARDLAW opened the driver's side window and the first thing he stated to EDWARDS was, "They asked you to leave, didn't they?"

58.     WARDLAW repeatedly told EDWARDS that she needed to leave the hospital while EDWARDS repeatedly told WARDLAW that she is suffering a medical emergency and cannot leave.



59.     WARDLAW told EDWARDS, "they say they want you gone, so you gotta go."

8

60.    EDWARDS further explained to WARDLAW that she cannot get out of the wheelchair and cannot walk because she is disabled from a previous stroke and her ankle is shattered.

61.    WARDLAW spoke to SECURITY GUARDS and advised them that EDWARDS is complaining of a present medical emergency.

62.    SECURITY GUARDS advised WARDLAW that EDWARDS had already been discharged.

63.    Neither WARDLAW nor SECURITY GUARDS confirmed that EDWARDS' present medical complaint was the same for which she was treated and discharged.

64.    In the presence of SECURITY GUARDS, WARDLAW stated to EDWARDS, "If the medical professionals have saw you and discharged you," to which EDWARDS replied, "They won't."

65.    In response, WARDLAW stated, "I got nothing to do with that."

66.    WARDLAW placed EDWARDS under physical arrest for trespassing.

67.    WARDLAW told EDWARDS, "you gotta find a way to get going."

68.    EDWARDS asked WARDLAW to call the preacher, but WARDLAW refused, stating that he does not know the number.

69.    While WARDLAW could have looked up the number, he did not.

70.    WARDLAW told EDWARDS that she is going to need to "roll this" (referring to the wheelchair), "off the property."

71.    SECURITY GUARDS advised WARDLAW that the hospital owns the wheelchair.

72.    In response, WARDLAW advised EDWARDS, "Well, you are gonna have to get up and figure out a way to be gone."

9

73. Ms. Edwards made statements including, "I've got nowhere to go," "I don't know what to do," "I had a stroke," "They beat me up last night," "I can't walk," "I've had a stroke on my left side," "My ankle's shattered," and "please don't hurt me no more."

74. When EDWARDS stated, "please don't hurt me no more," WARDLAW abruptly ended the conversation stating, "Start talking nonsense like that. I'm done with you. You'll go to jail."

75. WARDLAW failed to conduct an independent investigation into EDWARDS' medical condition or provide her with direct access to emergency medical care.

76. Instead, WARDLAW requested a transport vehicle for EDWARDS to be transported to jail.

77. SECURITY GUARDS and KNOXVILLE OFFICERS watched EDWARDS' medical condition deteriorate significantly without providing access to necessary and requested emergency medical care.

78. Specifically, SECURITY GUARDS and KNOXVILLE OFFICERS watched EDWARDS struggle to breathe, ignored her repeated statements that she couldn't breathe, ignored her requests for help, ignored her comment that she was sick, ignored her requests for a stretcher, ignored her requests to be taken back inside the hospital, and ignored her calls for a doctor.

79. This was an emergency medical condition that began and worsened on hospital property and that was unequivocally preventable and treatable.

80. DUGAN arrived with a marked police van, along with uniformed police officers BARNETT and DISTASIO.

81. KNOXVILLE OFFICERS attempted to load EDWARDS into the van for transport.

82. They demanded that she step into the van so that they did not have to push her in.

10

83. EDWARDS repeatedly advised KNOXVILLE OFFICERS that she could not get into the van without assistance.



84. During the encounter with the KNOXVILLE OFFICERS, Ms. Edwards stated, "Oh my God," "I'm gonna pass out" (repeatedly), "my purse, please ... my inhaler," "You guys can't do this to me," "I can't breathe" (repeatedly), "I'm going out," "get a stretcher," "I'm gonna have another (stroke)," "get me up, get me up," "I can't breathe, I'm gonna die," "please sit me up," "sit me up," "No, I don't want that (to go to jail)," "help me," "sir please," and "I'm gonna die."

85. EDWARDS was laid on the ground in just her hospital scrubs with her clothing exposing portions of buttocks.



86. EDWARDS' breathing was labored, and she slurred her words.

87. When a man walked by the scene, EDWARDS called out, "Doctor! Doctor!"

88. EDWARDS forewarned SECURITY GUARDS and KNOXVILLE OFFICERS stating, "I'm going out of my head" and "you're gonna kill me."

11

89. When EDWARDS asked for her inhaler while clearly in respiratory distress, BARNETT offered her a cigarette instead.

90. Eventually, EDWARDS' inhaler was located and provided to her for use.

91. Due to her clearly deteriorating medical condition, EDWARDS appeared unable to properly use her inhaler.

92. WARDLAW took the inhaler from EDWARDS and accused her of faking its use.

93. WARDLAW stated to SECURITY GUARDS and KNOXVILLE OFFICERS that if EDWARDS was not faking, she would inhale the medication and hold it in.

94. When continued efforts to get EDWARDS into the van failed, BARNETT stated, "Now you're starting to piss me off! Get up!"

95. WARDLAW stated, "Listen to me, this is the Lord's Day, all I want to do is get me some coffee and some oatmeal. I'm not gonna deal with your mess this morning."

96. WARDLAW further stated, "We've already spent too much time on you," and that he was "tired of this dead weight crap."

97. WARDLAW threatened EDWARDS "go on and get in there and pass out and we'll be done with it," and to "stuff you in the floor."

98. WARDLAW further threatened EDWARDS, stating, "You are about to get some more charges ... don't touch me ... this is ridiculous."

99. WARDLAW asked EDWARDS, "Have you ever been to the Knox County Jail? Them dudes don't play. You may not want to pull this act."

100. Acknowledging the seriousness of the situation and explaining it to the others, DUGAN stated, "she's saying she can't breathe, if she falls over either way, and she can't breathe, she dies, that's on me, I'm not willing to take that risk."

12

101. At one point, emergency room security officer, Michael Cotton, exited the hospital to check what was occurring.

102. Cotton returned to hospital registration to report EDWARDS' deteriorating condition and to request medical assistance for EDWARDS but was advised that the hospital would not send medical personnel to evaluate or treat EDWARDS' then current medical condition.

103. Cotton exited the hospital and advised UTLEY of same.

104. DISTASIO was on scene for approximately 25 minutes speaking to SECURITY GUARDS and KNOXVILLE OFFICERS and observing EDWARDS before EDWARDS was loaded into the back of his police vehicle.

105. KNOXVILLE OFFICERS did not place a seatbelt on EDWARDS.

106. SECURITY GUARDS and KNOXVILLE OFFICERS watched and heard EDWARDS struggling to sit herself up and ignored her repeated requests for help in doing so.

107. Instead of helping EDWARDS to sit up, DISTASIO sprayed WARDLAW with Lysol.

108. Meanwhile, DUGAN attempted to sit EDWARDS up stating, "I just worry about her falling and not breathing."

109. In the back of DISTASIO'S vehicle, EDWARDS urinated on herself.

110. BARNETT laughed at EDWARDS.

111. DISTASIO told EDWARDS, "You peed in my car . . . I'm sorry . . . you're not getting any help."

112. DISTASIO told the other SECURITY GUARDS and KNOXVILLE OFFICERS, "She peed in my car. I ain't doing that. I'm done helping her."

13

113.     While in DISTASIO'S vehicle, EDWARDS stated, "They're gonna kill me," "I can't breathe," and at least three times, "help me."

114.     Twice during the incident, before EDWARDS was placed in DISTASIO'S vehicle, SECURITY GUARDS went back into FORT SANDERS REGIONAL and asked for someone to check on EDWARDS' deteriorating medical condition.

115.     Both times, SECURITY GUARDS and FORT SANDERS REGIONAL refused to do so.

116.     Despite having first aid training, at no time during the incident did KNOXVILLE OFFICERS ask for any medical professional from FORT SANDERS REGIONAL to evaluate EDWARDS' deteriorating medical condition.

117.     Despite having first aid training, at no time during the incident did SECURITY GUARDS or KNOXVILLE OFFICERS summon third party medical personnel, i.e., EMS, to assist EDWARDS.

118.     DISTASIO began driving EDWARDS to the Roger D. Wilson Detention Facility, 5001 Maloneyville Road, Knoxville, TN 37918.

119.     During the drive, DISTASIO knocked on the divider window between the front and back seats.

120.     DISTASIO made the following statements to EDWARDS, "Stop it. I ain't dealing with you today," "Grow up. [You are] fine, [but] acting like a child" and commented on EDWARDS' moaning and groaning and told her to lift herself up.

121.     At least nine times, DISTASIO attempted to communicate with EDWARDS and observed that her responses became weaker and more incoherent.

14

122.     Eventually, DISTASIO observed that EDWARDS stopped responding and that she had fallen out of his view.

123.     Instead of immediately checking on EDWARDS' welfare, DISTASIO performed a traffic stop on an unrelated vehicle.

124.     Eventually, DISTASIO returned to his vehicle and opened the rear passenger door to check on EDWARDS.

125.     EDWARDS was "very pale" and "unconscious."

126.     DISTASIO pulled EDWARDS by her hair and commented presumably on the radio, "I don't know if she's faking it or what, but she's not answering me."

127.     DISTASIO gave EDWARDS a sternum rub but did not start CPR.

128.     An ambulance arrived and DISTASIO asked about using Narcan.

129.     One of the EMTs responded, "She doesn't need Narcan, she needs fucking chest compressions."

130.     EDWARDS was transported by ambulance back to FORT SANDERS REGIONAL where she suffered additional instances of cardiac arrest and a stroke.

131.     On February 6, 2023, EDWARDS died.

132.     During an autopsy, it was discovered that EDWARDS had suffered a new stroke.

133.     Christopher Lochmuller, MD, a Board Certified Forensic Pathologist, and the Deputy Chief Medical Examiner for Knox and Anderson Counties, performed an autopsy on EDWARDS and determined that EDWARDS' cause of death was an "ischemic stroke due to atherosclerotic cardiovascular disease. Other conditions that significantly contributed to death are hypertensive cardiovascular disease, morbid obesity, chronic alcohol abuse, acute bronchitis, and chronic obstructive pulmonary disease. The manner death is natural."

15

134. Ignoring the obvious refusal of SECURITY GUARDS and KNOXVILLE OFFICERS to provide EDWARDS with access to necessary emergency medical care for approximately one hour to treat her worsening respiratory distress, while at the same time causing EDWARDS to experience extreme emotional and physical distress, Dr. Lochmuller stated in his report,

> it is evident that at no time did law enforcement interaction cause or contribute to Ms. Edwards' death. Specifically, Ms. Edwards was not beaten by the police, she was never subdued, there was no physical struggle between law enforcement and Ms. Edwards, and there was no restraint asphyxia. Rather, Ms. Edwards went into cardiac arrest in the back of a police cruiser due to a combination of her natural diseases.

135. According to Dr. Lochmuller, it was apparently just a coincidence that EDWARDS happened to go into respiratory and cardiac arrest the first time at the very moment that she found herself in the back of a police cruiser.

136. The Knoxville Police Department conducted an internal investigation and determined that the following officers violated the referenced policies:

a. WARDLAW: Unbecoming Conduct, Neglect of Duty, Unsatisfactory Performance, Treatment of Prisoners, Courtesy, and Prisoner Transportation.

b. BARNETT: Unbecoming Conduct, Unsatisfactory Performance, Treatment of Prisoners, and Courtesy.

c. DISTASIO: Unbecoming Conduct, Neglect of Duty, Unsatisfactory Performance, Treatment of Prisoners, Courtesy, Prisoner Transportation, and Unconscious Persons.

137. As a result of the internal investigation, the CITY imposed the following discipline only:

a. WARDLAW: demoted from Sergeant to his previous rank of Police Officer.

b. DISTASTIO: suspended without pay for 10 days.

16

c. BARNETT: suspended without pay for 4 days.

138. The KNOXVILLE OFFICERS' conduct violated several criminal statutes. *See, e.g., § 39-16-402. Official Misconduct* ("refrains from performing a duty that is imposed by law or that is clearly inherent in the nature of the public servant's office or employment"); *§ 39-16-403. Official Oppression* ("Intentionally subjects another to mistreatment or to arrest, detention, stop, frisk, halt, search, seizure, dispossession, assessment or lien when the public servant knows the conduct is unlawful"); *§ 39-13-212. Criminally Negligent Homicide* ("Criminally negligent conduct that results in death constitutes criminally negligent homicide").

139. Regardless, relying Dr. Lochmuller's misleading report and statement, Charme P. Allen, Knox County District Attorney, declined to file criminal charges against the involved police officers who failed to perform their legal and employment duties, thereby causing EDWARDS' untimely death.

140. While EDWARDS' death was being investigated, COVENANT HEALTH, FORT SANDERS REGIONAL, and SHIELD AND BUCKLER SECURITY, INC.'S security agents and employees were advised by then security Captain, Markies Jordan, that unless directed to do so, they were not permitted to speak with anyone regarding the incident that caused EDWARDS' death.

141. Specifically, they were advised that if they violated the hush order, their employment would be terminated.

142. During the investigation, security cameras were used to monitor the location of investigators and to direct security personnel away from locations where investigators were headed.

17

143. In addition, a special representative was directed to the same locations to field any questions from investigators.

## IV. LEGAL CLAIMS[2]

### Count I

### BOYLAN v. COVENANT HEALTH, TEAMHEALTH, FORT SANDERS REGIONAL and KELLEN T. BANNON
### Violation of 42 U.S.C. § 1395dd
### Emergency Medical Treatment and Labor Act ("EMTALA")

144. Paragraphs 1 to 143 are incorporated herein by reference.

145. TEAMHEALTH, COVENANT HEALTH, FORT SANDERS REGIONAL and KELLEN T. BANNON'S conduct constitutes a violation of the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd.

146. The provisions of EMTALA apply to all individuals (not just Medicare beneficiaries) who attempt to gain access to a hospital for emergency care.

147. EMTALA required TEAMHEALTH, COVENANT HEALTH, FORT SANDERS REGIONAL and BANNON to provide EDWARDS with an appropriate medical screening examination, and provide necessary stabilizing treatment for emergency medical conditions within the hospital's capability and capacity.

148. TEAMHEALTH, COVENANT HEALTH, FORT SANDERS REGIONAL and BANNON, however, failed to provide EDWARDS with an appropriate medical screening

---

[2] In a Complaint, a Plaintiff is only required to plead facts, not legal theories. See Johnson v. City of Shelby, 574 U.S. 10 (2014) (Per Curiam) (reversing Fifth Circuit and holding that only facts need to be pled in a complaint, not legal theories). Plaintiff is only required to plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U. S. 544, 569-70 (2007); Ashcroft v. Iqbal, 556 U. S. 662 (2009). Plaintiff need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." FED.R.CIV.P 8(a)(2). "Each allegation must be simple, concise, and direct. No technical form is required." FED.R.CIV.P. 8(d)(1).

examination, and failed to provide EDWARDS with necessary stabilizing treatment for emergency medical conditions within the hospital's capability and capacity.

149. Instead, TEAMHEALTH, COVENANT HEALTH, FORT SANDERS REGIONAL and BANNON, discharged EDWARDS over her objection without first providing EDWARDS with an appropriate medical screening examination, and necessary stabilizing treatment for emergency medical conditions within the hospital's capability and capacity.

150. In addition, when EDWARDS requested emergency medical care during the incident with SECURITY GUARDS and KNOXVILLE OFFICERS, TEAMHEALTH, COVENANT HEALTH, FORT SANDERS REGIONAL and BANNON, refused to provide EDWARDS with an appropriate medical screening examination, and failed to provide EDWARDS with necessary stabilizing treatment for emergency medical conditions within the hospital's capability and capacity.

151. The denial of emergency medical care in this instance is consistent with similar incidents wherein TEAMHEALTH, COVENANT HEALTH, FORT SANDERS REGIONAL'S medical and security agents and employees denied persons necessary emergency medical care during medical emergencies that occurred on its property both prior to and after EDWARDS' death.

152. It is believed that one of those incidents also resulted in death.

153. As a direct and proximate result of the Defendants' conduct, EDWARDS suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and death.

154. As a direct and proximate result of the Defendants' conduct, Plaintiff has and will incur attorneys' fees and litigation costs.

19

## COUNT II

### BOYLAN v. WARDLAW
#### Fourth Amendment (False Arrest)
#### Pursuant to 42 U.S.C. § 1983

155. Paragraphs 1 to 143 are incorporated herein by reference.

156. The Fourth Amendment prohibits "unreasonable" "seizures." U.S. Const. amend. IV.

157. Police officers need "probable cause to believe that a criminal offense has been or is being committed" to support a warrantless arrest, *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004), or "a particularized and objective basis for suspecting [a] particular person of criminal activity" to support an investigatory stop, *U.S. v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016) (quoting *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008).

158. WARDLAW placed EDWARDS under arrest for trespass in retaliation for her statement, "please don't hurt me no more."

159. WARDLAW knew that EDWARDS wasn't refusing to leave the property but rather was physically incapable of leaving the property.

160. WARDLAW knew that EDWARDS had not committed the crime of trespass when he placed her under arrest.

161. As a direct and proximate result of the Defendants' conduct, EDWARDS suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and death.

162. As a direct and proximate result of the Defendants' conduct, Plaintiff has and will incur attorneys' fees and litigation costs.

20

<u>**Count III**</u>

**BOYLAN v. BRANDON WARDLAW,**
**ADAM BARNETT, TIMOTHY DISTASIO, and DANNY DUGAN**
**Deliberate Indifference to Serious Medical Needs**
**Fourteenth Amendment – Due Process (Pursuant to 42 U.S.C. § 1983)**

163.     Paragraphs 1 to 143 are incorporated herein by reference.

164.     EDWARDS was a pretrial detainee.

165.     Defendants were police officers acting under color of state law.

166.     In order to prove deliberate indifference to a serious medical need, a Plaintiff must demonstrate (1) a government official's subjective knowledge of a risk of serious harm; (2) the government official's disregard of the risk; (3) by conduct that is more than mere negligence. *See Nam Dang, by and through Vina Dang v. Sheriff, Seminole Cty. Fla.,* 871 F.3d 1272, 1280 (11th Cir. 2017).

167.     Deliberate indifference may be established by a failure to provide medical care and/or by excessive delay in providing medical care. *Lelieve v. Chief of Police Manuel Oroso,* 846 F.Supp.2d 1294, 1304 (S.D. Fla. Feb. 14, 2012).

168.     Each Defendant understood that EDWARDS was suffering from respiratory distress and in immediate need of emergency medical care.

169.     Each Defendant deliberately failed to provide EDWARDS with timely access to the requisite care, despite the ability to do so.

170.     As a direct and proximate result of the Defendants' conduct, EDWARDS suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and death.

171.     As a direct and proximate result of the Defendants' conduct, Plaintiff has and will incur attorneys' fees and litigation costs.

21

## COUNT IV

**BOYLAN v. BRANDON WARDLAW,**
**ADAM BARNETT, TIMOTHY DISTASIO, and DANNY DUGAN**
**Fourth Amendments (Duty to Intervene)**
**Pursuant to 42 U.S.C. § 1983**

172.    Paragraphs 1 to 143 are incorporated herein by reference.

173.    Pursuant to the Fourth Amendment, police officers have a duty to intervene to prevent another officer from causing a constitutional injury if they have both the opportunity and means to prevent the harm from occurring or continuing. *See Pineda v. Hamilton Cnty.,* 977 F.3d 483 (6th Cir. 2020).

174.    WARDLAW, BARNETT, DISTASIO, and DUGAN had a duty to intervene during the approximate one hour during which they observed their co-defendants failing to provide EDWARDS with necessary emergency medical care.

175.    WARDLAW, BARNETT, DISTASIO, and DUGAN had both the means and opportunity to do so but failed to do so.

176.    As a direct and proximate result of the Defendants' conduct, EDWARDS suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and death.

177.    As a direct and proximate result of the Defendants' conduct, Plaintiff has and will incur attorneys' fees and litigation costs.

22

## COUNT V

**BOYLAN v. BRANDON D. WARDLAW, ADAM BARNETT,
TIMOTHY DISTASIO, DANNY DUGAN, GERRID H. UTLEY,
ANTHONY SMITH, and CHRISTOPHER JONES
Conspiracy to Violate Federal Civil Rights
Pursuant to 42 U.S.C. § 1983**

178.    Paragraphs 1 to 143 are incorporated herein by reference.

179.    "A civil conspiracy is an agreement between two or more persons to injure another by unlawful action." *Hooks v. Hooks,* 771 F.2d 935, 943-44 (6th Cir. 1985).

180.    To prove conspiracy, plaintiffs must show (1) "that there was a single plan," (2) "that the alleged coconspirator shared in the general conspiratorial objective," and (3) "that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Id.* at 944 (citations omitted).

181.    A Plaintiff need not prove an express agreement among the conspirators, nor must the Plaintiff show that each conspirator knew "all of the details of the illegal plan or all of the participants involved." *Robertson v. Lucas,* 753 F.3d 606, 622 (6th Cir. 2014) (*quoting Hooks,* 771 F.2d at 944).

182.    Section 1983 civil conspiracy claims do not contain a "personal involvement" requirement because "section 1983 permits a jury to hold co-conspirators liable for the damages flowing from a constitutional deprivation that all of the co-conspirators may not have personally carried out." *Rieves v. Town of Smyrna,* 67 F.4th 856 (6th Cir. 2023) (quoting *Sánchez v. Foley,* 972 F.3d 1, 11 (1st Cir. 2020)).

183.    Liability for § 1983 conspiracy can attach even where "parties decide to act 'interdependently,' each actor deciding to act only because he was aware that the others would act similarly[.]" *Aubin v. Fudala,* 782 F.2d 280, 286 (1st Cir. 1983).

23

184.    WARDLAW, BARNETT, DISTASIO, DUGAN, UTLEY, SMITH and JONES, acted together to deprive EDWARDS of her right to receive emergency medical care in violation of the Fourteenth Amendment and EMTALA.

185.    As a direct and proximate result of the Defendants' conduct, EDWARDS suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and death.

186.    As a direct and proximate result of the Defendants' conduct, Plaintiff has and will incur attorneys' fees and litigation costs.

## COUNT VI

### BOYLAN v. BRANDON D. WARDLAW
### Fourth and Fourteenth Amendments—Supervisor liability
### Pursuant to 42 U.S.C. § 1983

187.    Paragraphs 1 to 143 are incorporated herein by reference.

188.    To establish supervisory liability under § 1983, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to people like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

189.    WARDLAW was the supervisor of BARNETT, DISTASIO, and DUGAN.

190.    WARDLAW participated in and permitted BARNETT, DISTASIO, and DUGAN, to participate in causing EDWARDS to suffer constitutional injuries.

191.    As a direct and proximate result of the Defendants' conduct, EDWARDS suffered

24

embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and death.

192.    As a direct and proximate result of the Defendants' conduct, Plaintiff has and will incur attorneys' fees and litigation costs.

## COUNT VII

**BOYLAN v. CITY OF KNOXVILLE, TENNESSEE**
**Fourth and Fourteenth Amendments—Monell Liability**
**Pursuant to 42 U.S.C. § 1983**

193.    Paragraphs 1 to 143 are incorporated herein by reference.

194.    "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).

195.    A failure to train can constitute deliberate indifference if "the municipality has failed to act 'in response to repeated complaints of constitutional violations by its officers,'" *Ouza v. City of Dearborn Heights,* 969 F.3d 265, 287 (6th Cir. 2020) (*quoting Cherrington v. Skeeter,* 344 F.3d 631, 646 (6th Cir. 2003)), or where the need for more training was "obvious." *See Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 409 (1997); *City of Canton v. Harris,* 489 U.S. 378, 390 (1989).

196.    During all relevant times, WARDLAW, BARNETT, DISTASIO, and DUGAN acted under color of state law as employees of CITY.

197.    CITY determined that WARDLAW, BARNETT, and DISTASIO, violated numerous policies of CITY.

25

198.    WARDLAW, BARNETT, and DISTASIO, violated said policies because CITY adopted but did not sufficiently train them regarding what the policies required.

199.    In addition, when WARDLAW, BARNETT, DISTASIO, and DUGAN failed to intervene to stop the co-defendants from causing or continuing constitutional injuries they did so because CITY did not have a policy requiring them to intervene.

200.    The identified policy and training deficiencies of CITY was the moving force that caused EDWARDS' constitutional injury.

201.    As a direct and proximate result of the Defendants' conduct, EDWARDS suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and death.

202.    As a direct and proximate result of the Defendants' conduct, Plaintiff has and will incur attorneys' fees and litigation costs.

## COUNT VIII

**BOYLAN v. CITY OF KNOXVILLE, TENNESSEE**
**Violation of Title II of the Americans with Disabilities Act ("ADA")**
**(pursuant to 42 U.S.C. § 12131, et seq.)**

203.    Paragraphs 1 to 143 are incorporated herein by reference.

204.    Pursuant to Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

205.    In order to state a claim pursuant to Title II of the ADA, a Plaintiff must allege that: (1) the subject of the discrimination was a qualified individual with a disability, (2) that he or she

26

was discriminated against by a public entity, and (3) that the discrimination was due to the disability.

206.    In addition, "[t]o prevail on a claim for compensatory damages under either the RA or the ADA, a plaintiff must show that a defendant violated his rights under the statutes and did so with discriminatory intent." McCullum v. Orlando Reg'l Healthcare Sys., 768 F.3d 1135, 1146-47 (11th Cir. 2014) (citations omitted).

207.    The Defendant CITY provides police services to the general public in Knoxville, Tennessee.

208.    KNOXVILLE OFFICERS are employees of the Defendant CITY, knew that EDWARDS suffered from a qualifying disability.

209.    KNOXVILLE OFFICERS joked about the situation presented by EDWARDS' medical symptoms; evidencing a callous disregard for EDWARDS' emotional wellbeing, and a discriminatory motive toward her disability.

210.    Probable cause did not exist to arrest EDWARDS for any crime.

211.    A person who did not suffer from the same disability as EDWARDS would not have been subjected to a denial of medical care, unsafe transportation, and harassment.

212.    As a direct and proximate result of the Defendants' conduct, EDWARDS suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and death.

213.    As a direct and proximate result of the Defendants' conduct, Plaintiff has and will incur attorneys' fees and litigation costs.

## COUNT IX

### BOYLAN v. CITY OF KNOXVILLE, TENNESSEE
### Violation of Section 504 of the Rehabilitation Act ("Rehabilitation Act")
### (pursuant to 29 U.S.C. § 794)

214.     Paragraphs 1 to 143 are incorporated herein by reference.

215.     Pursuant to the Rehabilitation Act, no "qualified individual with a disability . . . shall, solely by reason of his or her disability . . . be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794.

216.     In order to state a claim pursuant to Section 504 of the Rehabilitation Act, a Plaintiff must allege that: (1) the subject of the discrimination was a qualified individual with a disability, (2) that he or she was discriminated against by a public entity, and (3) that the discrimination was due to the disability.

217.     In addition, to prevail on a claim for compensatory damages under either the RA or the ADA, a plaintiff must show that a defendant violated his rights under the statutes and did so with discriminatory intent.

218.     The Defendant CITY provides police services to the general public in Knoxville, Tennessee.

219.     KNOXVILLE OFFICERS are employees of the Defendant CITY, knew that EDWARDS suffered from a qualifying disability.

220.     KNOXVILLE OFFICERS joked about the situation presented by EDWARDS' medical symptoms; evidencing a callous disregard for EDWARDS' emotional wellbeing, and a discriminatory motive toward her disability.

221.     Probable cause did not exist to arrest EDWARDS for any crime.

28

222.    A person who did not suffer from the same disability as EDWARDS would not have been subjected to a denial of medical care, unsafe transportation, and harassment.

223.    As a direct and proximate result of the Defendants' conduct, EDWARDS suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and death.

224.    As a direct and proximate result of the Defendants' conduct, Plaintiff has and will incur attorneys' fees and litigation costs.

<u>**COUNT X**</u>

**BOYLAN v. TEAMHEALTH,**
**FORT SANDERS REGIONAL, and COVENANT HEALTH**
**Violation of Title II and Title III of the Americans with Disabilities Act ("ADA")**
**(pursuant to 42 U.S.C. § 12131, et seq., and 42 U.S.C. § 12181, et seq.)**

225.    Paragraphs 1 to 143 are incorporated herein by reference.

226.    TEAMHEALTH, COVENANT HEALTH and FORT SANDERS REGIONAL must comply with the Americans with Disabilities Act, either Title II – governing private hospitals, or Title III – governing public hospitals.

227.    TEAMHEALTH, COVENANT HEALTH and FORT SANDERS REGIONAL offer emergency medical care to the general public.

228.    Medical personnel employed by TEAMHEALTH, COVENANT HEALTH and FORT SANDERS REGIONAL knew that EDWARDS suffered from a qualifying disability.

229.    Medical personnel employed by TEAMHEALTH, COVENANT HEALTH and FORT SANDERS REGIONAL joked about the situation presented by EDWARDS' medical symptoms; evidencing a callous disregard for EDWARDS' emotional wellbeing, and a discriminatory motive toward her disability.

29

230. A person who did not suffer from the same disability as EDWARDS would not have been subjected to a denial of medical care, unsafe transportation, and harassment.

231. As a direct and proximate result of the Defendants' conduct, EDWARDS suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and death.

232. As a direct and proximate result of the Defendants' conduct, Plaintiff has and will incur attorneys' fees and litigation costs.

## COUNT XI

### BOYLAN v. TEAMHEALTH,
### FORT SANDERS REGIONAL, and COVENANT HEALTH
### Violation of Section 504 of the Rehabilitation Act ("Rehabilitation Act")
### (pursuant to 29 U.S.C. § 794)

233. Paragraphs 1 to 143 are incorporated herein by reference.

234. TEAMHEALTH, COVENANT HEALTH and FORT SANDERS REGIONAL offer emergency medical care to the general public.

235. Medical personnel employed by TEAMHEALTH, COVENANT HEALTH and FORT SANDERS REGIONAL knew that EDWARDS suffered from a qualifying disability.

236. Medical personnel employed by TEAMHEALTH, COVENANT HEALTH and FORT SANDERS REGIONAL joked about the situation presented by EDWARDS' medical symptoms; evidencing a callous disregard for EDWARDS' emotional wellbeing, and a discriminatory motive toward her disability.

237. A person who did not suffer from the same disability as EDWARDS would not have been subjected to a denial of medical care, unsafe transportation, and harassment.

30

238.     As a direct and proximate result of the Defendants' conduct, EDWARDS suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and death.

239.     As a direct and proximate result of the Defendants' conduct, Plaintiff has and will incur attorneys' fees and litigation costs.

### COUNT XII

**BOYLAN v. BRANDON WARDLAW, ADAM BARNETT,
TIMOTHY DISTASIO, DANNY DUGAN, GERRID H. UTLEY,
ANTHONY SMITH, and CHRISTOPHER JONES**
**Intentional Infliction of Emotional Distress**
**Pursuant to Tennessee State Law**

240.     Paragraphs 1 to 143 are incorporated herein by reference.

241.     To establish an intentional infliction of emotional distress claim a Plaintiff must establish that (1) the conduct he complains of was intentional or reckless; (2) the conduct was so outrageous that it is not tolerated by civilized society; and (3) the conduct resulted in serious mental injury. *Fitzgerald v. Hickman Cnty. Gov't,* 2018 WL 1634111, at *14 (Tenn. Ct. App. Apr. 4, 2018) (*citing Rogers v. Louisville Land Co.,* 367 S.W.3d 196, 205 (Tenn. 2012)); *Kilpatrick v. HCA Human Res., LLC,* Case No. 19-5230 (6th Cir. Dec 17, 2020).

242.     WARDLAW, BARNETT, DISTASIO, DUGAN, UTLEY, SMITH and JONES' conduct was reckless, outrageous, and caused EDWARDS to suffer a serious mental injury.

243.     As a direct and proximate result of the Defendants' conduct, EDWARDS suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and death.

244.     As a direct and proximate result of the Defendants' conduct, Plaintiff has and will incur attorneys' fees and litigation costs.

## COUNT XIII

**BOYLAN v. GERRID H. UTLEY,**
**ANTHONY SMITH, and CHRISTOPHER JONES**
**Negligence**
**Pursuant to Tennessee State Law**

245. Paragraphs 1 to 143 are incorporated herein by reference.

246. UTLEY, SMITH, and JONES, engaged in negligent conduct that caused EDWARDS' injuries and death.

247. As a direct and proximate result of the Defendants' conduct, EDWARDS suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and death.

248. As a direct and proximate result of the Defendants' conduct, Plaintiff has and will incur attorneys' fees and litigation costs.


## COUNT XIV

**BOYLAN v. SHIELD AND BUCKLER SECURITY, INC.,**
**FORT SANDERS REGIONAL, and COVENANT HEALTH**
**Vicarious Liability**
**Pursuant to Tennessee State Law**

249. Paragraphs 1 to 143 are incorporated herein by reference.

250. The common-law framework governing vicarious liability claims in Tennessee is "well-established." *Abshure v. Methodist Healthcare-Memphis Hosps.*, 325 S.W.3d 98, 105-06 (Tenn. 2010).

251. "[A] principal may be held vicariously liable for the negligent acts of its agent when the acts are within the actual or apparent scope of the agent's authority." *Id.* at 105.

252. UTLEY, SMITH, and JONES, were agents and/or employees of COVENANT HEALTH, FORT SANDERS REGIONAL, and SHIELD AND BUCKLER SECURITY, INC.

32

253. As such, COVENANT HEALTH, FORT SANDERS REGIONAL, and SHIELD AND BUCKLER SECURITY, INC., are vicariously liable for the injuries caused by the negligent acts committed by UTLEY, SMITH, and JONES.

218. As a direct and proximate cause of Defendants' conduct that caused EDWARDS' wrongful death, EDWARDS' survivors suffered a financial loss associated in large part with mental anguish, lost services, society, guidance, companionship, relationship, and comfort.

219. As a direct and proximate result of the Defendants' conduct, Plaintiff has and will incur attorneys' fees and litigation costs.

### COUNT XV

**BOYLAN v. BRANDON WARDLAW, ADAM BARNETT,**
**TIMOTHY DISTASIO, and DANNY DUGAN**
**Willful, Wanton, or Gross negligence**
**Pursuant to Tennessee State Law**

254. Paragraphs 1 to 143 are incorporated herein by reference.

255. WARDLAW, BARNETT, DISTASIO, and DUGAN engaged in willful, wanton, or gross negligent conduct that caused EDWARDS' injuries and death.

256. The conduct that they engaged in was the failure to provide services to EDWARDS that were not discretionary.

257. As a direct and proximate result of the Defendants' conduct, EDWARDS suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and death.

258. As a direct and proximate result of the Defendants' conduct, Plaintiff has and will incur attorneys' fees and litigation costs.

33

## COUNT XVI

### BOYLAN v. CITY OF KNOXVILLE, TENNESSEE
### Removal of Immunity for Injury Caused by Negligent Act or Omission of Employees
### Pursuant to § 29-20-205 of Tennessee State Law

259.    Paragraphs 1 to 143 are incorporated herein by reference.

260.    WARDLAW, BARNETT, DISTASIO, and DUGAN were employed by the CITY.

261.    WARDLAW, BARNETT, DISTASIO, and DUGAN engaged in ordinary negligent conduct that caused EDWARDS' injuries and death.

262.    The conduct that they engaged in was the failure to provide services to EDWARDS that were not discretionary.

263.    As such, the CITY is liable for WARDLAW, BARNETT, DISTASIO, and DUGAN'S ordinary negligent conduct.

264.    As a direct and proximate result of the Defendants' conduct, EDWARDS suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and death.

265.    As a direct and proximate result of the Defendants' conduct, Plaintiff has and will incur attorneys' fees and litigation costs.

## COUNT XVII

### BOYLAN v. DEFENDANTS
### Survival Claim
### Injury Resulting in Death § 20-5-106
### Pursuant to Tennessee State Law

266.    Paragraphs 1 to 143 are incorporated herein by reference.

267.    BOYLAN is the duly appointed Administrator of the ESTATE OF LISA LYNN EDWARDS.

268.    BOYLAN is asserting this Survival Claim on behalf of the ESTATE to recover all

34

damages permitted by law.

269. As a direct and proximate result of the Defendants' conduct, EDWARDS suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and death.

270. As a direct and proximate result of the Defendants' conduct, Plaintiff has and will incur attorneys' fees and litigation costs.

<u>**COUNT XVIII**</u>

**BOYLAN v. DEFENDANTS**
**Wrongful Death Claim**
**Damages Recoverable in Wrongful Death § 20-5-113**
**Pursuant to Tennessee State Law**

271. Paragraphs 1 to 143 are incorporated herein by reference.

272. The Defendants' wrongful and reckless conduct caused EDWARDS to suffer death.

273. BOYLAN is the duly appointed Administrator of the ESTATE OF LISA LYNN EDWARDS.

274. BOYLAN is the duly appointed Administrator of the ESTATE, is asserting this wrongful death claim on behalf of himself and all survivors, to recover all damages permitted by law.

275. EDWARDS is survived by her two biological sons – Timothy Todd Boylan, Jr., and Todd Lynn Boylan.

276. As a direct and proximate cause of Defendants' conduct that caused EDWARDS' wrongful death, EDWARDS' survivors suffered a financial loss associated in large part with mental anguish, lost services, society, guidance, companionship, relationship, and comfort.

277. As a direct and proximate result of the Defendants' conduct, Plaintiff has and will

35

incur attorneys' fees and litigation costs.

## V.   <u>REQUEST FOR RELIEF</u>

**WHEREFORE**, BOYLAN respectfully requests that judgment be entered in his favor as follows:

A.      **Declaratory Judgment:** Providing that the Defendants' individual and collective conduct violated EDWARDS' state and federal rights;

B.      **Compensatory Damages:** Including, but not limited to, the monetary value associated with the following: violations of legal rights, embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and death;

C.      **Punitive damages** as permitted by law;

D.      **Equitable Relief:** An admission of the allegations stated in the Complaint, in writing, and an oral and written apology for same, in person, from Defendants;

E.      **Attorney's Fees and Costs**; and

F.      **Discretionary Damages and Relief:** Such other financial or equitable relief that the Court deems reasonable and just.

## VI.   JURY TRIAL DEMAND

BOYLAN respectfully requests a trial by jury on all claims/issues in this matter that may

be tried to a jury.

**Respectfully Submitted,**

*Devon M. Jacob*                                         Date: January 30, 2024
_____
**DEVON M. JACOB, ESQUIRE**
PA Bar Number: 89182
**JACOB LITIGATION, INC.**
P.O. Box 837, Mechanicsburg, Pa. 17055-0837
717.796.7733 | djacob@jacoblitigation.com
(Plaintiff's Counsel)