UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| TIMOTHY T. BOYLAN, J.R., Personally, and as the Administrator of the ESTATE OF LISA LYNN EDWARDS, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 3:24-CV-39-CEA-DCP |
| v. | ) ) | |
| BRANDON D. WARDLAW, *et al.*, | ) ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This case is before the Court pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court is Plaintiff's Motion: (1) To Compel Production of a Compliant Privilege Log, (2) for *In Camera* Inspection of Documents, and (3) to Compel Production of Documents ("Motion to Compel") [Doc. 93]. Defendants have filed a response in opposition to the motion [Doc. 97] and Plaintiff has replied [Doc. 98]. The motion is ripe for adjudication. *See* E.D. Tenn. L.R. 7.1(a). For the reasons explained below, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion to Compel [**Doc. 93**].

I.      **BACKGROUND**

Plaintiff is the son of Lisa Lynn Edwards (hereinafter, "Decedent") [Doc. 110 p. 2]. On February 4, 2023, Decedent flew from Rhode Island to Tennessee and fell ill during the flight [*Id.* at 5]. According to the Complaint,[1] Decedent "presented in the Blount emergency department with

---

[1]      All references to the Complaint are to the Amended Complaint [Doc. 110].

a chief complaint of abdominal pain" and was treated and discharged on the same date around 10:35 p.m. [*Id.*]. Decedent then presented in the emergency room at Fort Sanders Regional around 11:57 p.m. "and requested a medical evaluation and care" [*Id.*]. Plaintiff notes that there are three physicians referred to in Decedent's records, but that Dr. Kellen T. Bannon "appears to be the physician of record" [*Id.* at 6]. Dr. Bannon discharged Decedent "from the emergency department over her repeated verbal objections" despite having "not conducted an appropriate medical evaluation" [*Id.*]. Decedent "had several vital signs that remained outside normal values . . . [her] tachycardia had steadily worsened . . . [she] had three out of four Systemic Inflammatory Response Syndrome ("SIRS") criteria, a clear warning of an emergency medical condition . . . an elevated white blood count . . . an unexplained negative change in her mental status . . . and [her] vitals suggested she was experiencing a mild COPD exacerbation that she could have recovered from had she received proper medical care prior to her discharge from the emergency room" [*Id.* at 6–7]. Decedent "repeatedly requested medical care while on the hospital property, objected to being required to leave the hospital, and was ultimately arrested for [t]respass" [*Id.* at 7].

The Complaint alleges that Decedent was rolled in a wheelchair by security guards "into the freezing cold weather wearing only paper scrubs, placed under physical arrest for [t]respass, and forcibly removed by police officers from the hospital property" [*Id.* at 8]. Decedent "attempted to advocate on behalf of herself and again requested an appropriate medical evaluation," but was denied by security guards [*Id.*]. When Decedent again refused to leave, the security guards "called 911 and requested a police response from Knoxville Police Department" [*Id.*]. When the police arrived, they instructed Decedent "that she needed to leave the hospital's property" [*Id.* at 9]. Decedent responded "that she was suffering from a medical emergency and could not leave" and further explained that "she could not get out of the wheelchair and could not walk because she was

2

disabled from a previous stroke and had an ankle injury" [*Id.*]. Decedent was then placed under arrest for trespass and taken into custody [*Id.* at 11].

When the transport vehicle arrived, Decedent informed Knoxville Police Officers that "she could not get in the van without assistance" and reportedly told them that she could not breathe, that she was going to pass out, and that she was dying [*Id.* at 12–13]. When officers eventually gave Decedent her inhaler, Decedent was not able to use it and was "accused . . . of faking its use" [*Id.* at 13]. An emergency room security officer investigated the scene and returned to report Decedent's "deteriorating emergency medical condition and to request emergency medical assistance" [*Id.* at 14]. Plaintiff contends that while Decedent "was continuing to suffer from a visibly worsening medical emergency," Covenant Health, Fort Sanders Regional, and Dr. Bannon were aware of the request for an appropriate medical evaluation and treatment, but Fort Sanders Regional advised "that it would not send qualified medical personnel to evaluate or treat [Decedent]" [*Id.* at 15].

Decedent was then placed in the back of a police vehicle, where she urinated on herself and stated, "They're going to kill me," "I can't breathe," and "[H]elp me" [*Id.* at 17]. During the ride to the Roger D. Wilson Detention Facility, Decedent's "responses became weaker and more incoherent" [*Id.* at 19]. Decedent "stopped responding" and fell out of the driving officer's view [*Id.*]. Instead of checking on Decedent, the driving officer "performed a traffic stop on an unrelated vehicle" and then checked on Decedent who was "very pale" and "unconscious" [*Id.*]. An ambulance arrived and transported Decedent back to Fort Sanders Regional "where she suffered additional instances of respiratory and cardiac arrest, and a stroke" [*Id.* at 20]. "On February 6, 2023, [Decedent] died as a result of the injuries that she suffered from the Defendants' conduct" [*Id.*].

Based on the above, Plaintiff alleges that Defendants' conduct constitutes a violation of the Emergency Medical Treatment and Labor Act ("EMTALA") under 42 U.S.C. § 1395dd [*id.* at 22–25]; various claims under 42 U.S.C. § 1983, including false arrest in violation of the Fourth Amendment [*id.* at 25–26], deliberate indifference to serious medical needs in violation of the Fourteenth Amendment [*id.* at 26–27], Fourth Amendment and Fourteenth Amendment duty to intervene [*id.* at 27–28], conspiracy to violate federal civil rights [*id.* at 28–30], and supervisor and *Monell* liability under the Fourth and Fourteenth Amendment [*id.* at 30–33]; violations of Title II of the Americans with Disabilities Act ("ADA") pursuant to 42 U.S.C. § 12131, *et seq.* [*id.* at 33–34]; violation of Section 504 of the Rehabilitation Act under 29 U.S.C. § 794 [*id.* at 34–35]; violation of Tenn. Code Ann. § 68-140-201's duty to furnish hospital emergency services [*id.* at 36–38]; state law claims of intentional infliction of emotional distress [*id.* at 38–39], negligence [*id.* at 39], vicarious liability [*id.* at 39–40]; willful, wanton, or gross negligence [*id.* at 40–41], removal of immunity for injury caused by negligent act or omission of employees pursuant to Tenn. Code Ann. § 29-20-205 [*id.* at 41], medical malpractice [*id.* at 42–50]; survival – injury resulting in death pursuant to Tenn. Code Ann. § 20-5-106 [*id.* at 50], and requests damages recoverable in wrongful death pursuant to Tenn. Code Ann. § 20-5-113.90 [*id.* at 51].

This case was initiated on February 1, 2024 [Doc. 1]. On October 17, 2025, Plaintiff sent a letter to Defendants explaining there was a discovery dispute related to Defendants' responses and objections to Interrogatories, Requests for the Production of Documents, and Requests for Admissions, as well as Defendants' intent to file a motion to quash the subpoenas Plaintiff had served [Doc. 93-1]. On November 5, 2025, Defendants withdrew their objections to the subpoenas, and on November 21, 2025, sent a letter providing their position regarding the discovery dispute, as well as supplemental responses [Doc. 93-2].

4

Plaintiff moves for an order compelling Defendants to produce a privilege log compliant with Federal Rule of Civil Procedure 26(b)(5), submit documents withheld on the basis of privilege for *in camera* inspection, and produce materials improperly withheld under the Tennessee Patient Safety and Quality Improvement Act ("TPSQIA"), codified at Tenn. Code Ann. § 68-11-272, as well as under the attorney-client and work product privileges [Doc. 93 pp. 17–22]. Plaintiff argues that TPSQIA's protection is unavailable in this case, because federal privilege law governs all claims arising under federal-question jurisdiction pursuant to 28 U.S.C. § 1331 [*Id.* at 10–13]. In support, Plaintiff notes "[n]either the United States Supreme Court nor the Sixth Circuit has recognized a medical peer review privilege under federal common law" [*Id.* at 11 (quoting *McCleary v. QCHC of Tennessee, PLLC*, No. 3:23-cv-00385, 2025 WL 296142, at *4 (E.D. Tenn. Jan. 24, 2025)].

Alternatively, Plaintiff argues that, even if TPSQIA applies, Defendants "have not demonstrated that they qualify for such protection," as they have "made a voluntary public disclosure of the investigations' bottom-line conclusions" [*Id.* at 13, 15]. Further, Plaintiff submits that the attorney client and work product privileges do not apply to the withheld materials, asserting that the documents were created "in the ordinary course of patient care or compliance" [*Id.* at 17–18].

Defendants respond in opposition, reasoning that "[b]ecause the present action alleges state-law medical malpractice claims alongside a federal question," TPSQIA applies, or alternatively, that the Court should "recognize[] a federal common law privilege for the quality improvement and medical peer review records in this action" [Doc. 97 p. 6]. Defendants further contend that the federal PSQIA does not preempt the application of the TPSQIA [*Id.* at 13]. In addition, Defendants assert that some of the withheld materials are protected by the attorney-client

5

privilege and work-product doctrine because they were created for and as a result of the Quality Improvement Committee ("QIC") investigation [*Id.* at 21].

In reply, Plaintiff emphasizes that his "state law medical malpractice claim is only 1 of 20 claims asserted" [Doc. 98 pp. 5–6]. Plaintiff argues that Defendants had asserted a Tennessee statutory privilege under TPSQIA but are now "asking this Court to supplant the state law statutory privilege in place of its federal equivalent – the PSQIA, or alternatively, to create a new federal common law privilege" [*Id.* at 6].

## II.    ANALYSIS

Rule 26 of the Federal Rules of Civil Procedure governs the scope of discovery. Fed. R. Civ. P. 26(b). It states, "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). Federal Rule of Evidence 501 governs whether a matter is privileged. It provides:

> The common law--as interpreted by United States courts in the light of reason and experience--governs a claim of privilege unless any of the following provides otherwise:
> • the United States Constitution;
> • a federal statute; or
> • rules prescribed by the Supreme Court.

Fed. R. Evid. 501. "[W]here there is no dispute as to the relevance of the requested information, the burden of establishing that otherwise relevant discovery is privileged is on the party asserting the privilege." *Hubble v. Cnty. of Macomb*, No. CV 16-13504, 2017 WL 11565718, at *2 (E.D. Mich. Aug. 23, 2017) (citation omitted), *aff'd*, No. 16-CV-13504, 2017 WL 5952119 (E.D. Mich. Dec. 1, 2017).

6

### A.     Medical Peer Review Privilege[2]

The first question the Court must address is whether federal or state law of privilege governs the claims in this case. Plaintiff contends that federal privilege law applies to all claims in this matter, because "this case is being prosecuted pursuant to 28 U.S.C. § 1331 (federal question)" [Doc. 93 p. 11]. Plaintiff maintains that "Rule 501's legislative history confirms Congress's intended choice of law rule: in federal question cases, federal privilege law applies even when supplemental state law claims are joined" [*Id.* (citing S. Rep. No. 93-1277, at 13 n.16 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7059 n.16; H.R. Conf. Rep. No. 93-1597, at 7–8 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7098, 7101–02)].

In response, Defendants assert that the "[a]pplication of the [state law privilege] is appropriate on the facts of this case, or alternatively, the recognition of a federal peer review privilege is appropriate on the facts of this case" [Doc. 97 pp. 2–3]. They posit that TPSQIA is "applicable in this case filed in federal court with claims both of federal question, and pertinently, of state law medical malpractice" [*Id.* at 4].

Here, Plaintiff brings nine state claims under the Court's supplemental jurisdiction. [Doc. 110 pp. 36–51]. The Court has supplemental jurisdiction over "'other [state] claims' in the same case or controversy as a claim within the district court['s] original jurisdiction." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting 28 U.S.C. § 1367(a)). Federal Rule of Evidence 501 states that, "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501. The Committee notes of the Federal Rules of Evidence explain, "Federal law of privileges should be applied with respect

---

[2]     At issue here is a quality assurance or improvement process/peer review system related to the quality of patient care and healthcare services, which will be generally referred to as a "medical peer review privilege."

to pendent State law claims when they arise in a Federal question case." Fed. R. Evid. 501 advisory committee's note to 1974 amendment. In cases presenting a federal question, "federal privilege law applies to all claims," including claims brought under the court's supplemental jurisdiction, "in order to avoid conflicting application in the same case." *UAW v. Honeywell Int'l, Inc.*, 300 F.R.D. 323, 327 (E.D. Mich. 2014).

The Sixth Circuit has made clear that in federal question cases, questions of privilege are governed by federal common law. *Reed v. Baxter*, 134 F.3d 351, 355 (6th Cir. 1998); *see Zamorano v. Wayne State Univ.*, No. 07-12943, 2008 WL 2067005, at *4 (E.D. Mich. May 15, 2008) (noting that the Sixth Circuit has held that "in a federal question case with pendent state claims, it was required to apply the federal law of privilege . . . ."). In *Hancock v. Dodson*, 985 F.2d 1367, 1374 (6th Cir. 1992), the Sixth Circuit stated that because the "case is a federal question case by the virtue of the appellant's section 1983 claim, we hold that the existence of pendent state law claims does not relieve us of our obligation to apply the federal law of privilege." Accordingly, because "[t]he Sixth Circuit applies the federal law of privilege to cases where there are both state and federal claims and where the court's jurisdiction is based on a federal question," the Court finds that federal privilege law governs in this action. *Zamorano*, 2008 WL 2067005, at *5.

The next question is whether federal common law supports the existence or application of a medical peer review privilege.

As an initial matter, the Court acknowledges that Tennessee recognizes a medical peer review privilege. TPQSIA "creates a state law privilege for Quality Improvement Committees ("QICs") created by healthcare providers to, among other things, make sure healthcare providers are in compliance with state and federal law." *Allgood v. Baptist Memorial Medical Grp., Inc.*, No. 19-2323, 2020 WL 86455, at *2 (W.D. Tenn. Jan. 7, 2020). TPSQIA "allow[s] healthcare

8

organizations to freely examine how they can improve their services without fear that candid statements will be used against them." *Id.* (citing *Pinkard v. HCA Health Servs. of Tenn., Inc.*, 545 S.W.3d 443 (Tenn. Ct. App. 2017), *overruled in part by Castillo v. Rex*, 715 S.W.3d 321 (Tenn. 2025)). Further, the Court acknowledges that "the states are substantially, if not completely, in harmony in recognizing a physician peer review privilege." *Nilavar v. Mercy Health Syst.-Western Ohio*, 210 F.R.D. 597, 607 (S.D. Ohio 2002).

Even so, the overwhelming weight of authority holds that no medical peer review privilege exists under federal common law. *See, e.g.*, *Univ. of Pa. v. Equal Employment Opportunity Comm'n*, 4983 U.S. 182, 189 (1990) (finding that an academic peer review privilege has no historical basis in the federal common law); *Nilavar,* 210 F.R.D. at 601–03 (collecting cases); *Levans v. Saint Francis Hosp.-Bartlett, Inc.*, No. 15-CV-2142, 2015 WL 11017962, at *3 (W.D. Tenn. Sept. 18, 2015) ("Neither the United States Supreme Court nor the Sixth Circuit has recognized a medical peer review privilege under federal common law.").

Accordingly, district courts within Tennessee have held that the medical peer review privilege created by TPSQIA does not apply in federal question cases. *Allgood*, 2020 WL 86455, at *2 ("Because this is a federal question case, T.C.A. § 68-11-272(c)(1) does not apply."); *see Coone v. Chattanooga-Hamilton Cty. Hosp. Auth.*, No. 1:16-CV-481, 2017 WL 9476830, at *4 (E.D. Tenn. May 18, 2017) ( "[F]ederal law does not recognize a peer review privilege and state privilege law does not apply in a case where subject matter jurisdiction is based on a federal question[.]"); *Levans v. Sant Francis-Hosp.-Bartlett, Inc.*, No. 15-CV-2142, 2015 WL 11017962, at *3 (W.D. Tenn. Sept. 18, 2015) (declining to apply TPSQIA where the only claim before the court arose under EMTALA); *United States v. Jackson Madison Cty. Gen. Hosp.*, No. 12-2226,

2012 WL 12899055, at *3 (W.D. Tenn. Oct. 16, 2012) (declining to recognize the state-law privilege in a Medicare/Medicaid fraud case).

Plaintiff notes that "[i]n the absence of a common law medical peer review privilege, Congress considered the issue, and in 2005, passed the Patient Safety Quality Improvement Act of 2005 ("PSQIA"), 42 U.S.C. §§ 299b-21 to 299b-26" [Doc. 93 p. 11]. Plaintiff submits that "[i]f Defendants wanted federal peer review protection, they were required to assert the privilege and meet their burden related to same" [*Id.* at 12]. In response, Defendants contend that "[t]he enactment of the federal PSQIA, in and of itself, demonstrates a Congressional intent to protect patient safety work product from the discovery process" [Doc. 97 p. 14] Defendants point to a decision from the District of Massachusetts, *Tep v. Southcoast Hosps. Grp., Inc.*, No. 13-11887, 2014 WL 6873137 (D. Mass. Dec. 4, 2014), and posit that "[t]hough the defendant healthcare providers in *Tep* did not assert that the disputed documents were privileged by the PSQIA, the district court nonetheless assessed the PSQIA to determine Congressional intent with regard to the recognition of a medical peer review privilege in federal actions" [*Id.* (citing *Tep*, 2014 WL 6873137, at *15–16)]. But Defendants failed to raise PSQIA as a privilege, and do not get to do so now. *See John B. v. Goetz*, 879 F. Supp. 2d 787, 891 (M.D. Tenn. 2010) (finding that "a party's failure to assert a privilege on a privilege log constitutes a waiver of that privilege" (citing *Bowling v. Scott Cnty.* , No. 3:04-CV-554, 2006 WL 2336333, at *3 (E.D. Tenn. Aug. 10, 2006))).[3]

---

[3] Notably, the court in *Tep* held, "No peer review privilege exists in the Federal Rules of Evidence, nor does any federal statute create a privilege directly applicable here." *Tep*, 2014 WL 6873137, at *2. The court, however, applied the peer review privilege in that case. *Id.* at *5–6. The Court finds that the decision in *Tep* is not only non-binding on this Court but also inapposite. In determining whether to apply the privilege, the court in *Tep* analyzed the issue using factors developed in the First Circuit. *Id.* at *3–4 (citing *In re Hampers*, 651 F.2d 19, 22 (1st Cir. 1981)). The Sixth Circuit has not adopted those factors. Further, in *Tep*, the court highlighted that "the parties appear to agree that the facts necessary to develop Tep's EMTALA claim have been disclosed in other documents contained in the relevant medical files, as the events central to Tep's

Having determined that that federal common law does not recognize a medical peer review privilege, the Court turns to the final question of whether to apply TPSQIA. "To determine whether to recognize a state evidentiary privilege, federal courts must engage in a balancing process. The court must weigh the state's interest in confidentiality of physician peer review proceedings against the evidentiary need for disclosure of relevant and probative information." *In re Dep't of Justice Subpoena Duces Tecum to Custodian of Records for Baptist Mem'l Hosp.* ("*In re DOJ Subpoena*"), No. 04-MC-018, 2004 WL 2905391, at \*2 (W.D. Tenn. June 22, 2004) (citations omitted). In determining whether to recognize a privilege, courts consider three broad factors identified by the Supreme Court: "(1) whether the privilege serves private and public interests; (2) the evidentiary benefit that would result from the denial of the privilege; and (3) the recognition of the privilege among the States." *Veith v. Portage Cty.*, No. 5:11CV2542, 2012 WL 4850197, at \*3 (N.D. Ohio 11, 2012) (citing *Jaffee v. Redmond*, 518 U.S. 1, 10–12 (1996)). Although "[f]ederal courts are not required to recognize state law privileges in federal question cases," the existence of such privileges remain relevant to the analysis, "particularly where a significant number of states recognize such a privilege." *Jaffee*, 518 U.S. at 12–13. While Defendants reference this balancing test in their response, they only substantively address the first and third factors, without discussion of the evidentiary benefit. Plaintiff did not address the factors in his reply.

As previously noted, there is essentially uniform recognition among the states of a medical peer review privilege, and thus, the third factor would weigh in favor of applying the privilege. The remaining considerations, however, do not weigh in favor of recognizing the privilege in this case where Plaintiff not only alleges a medical malpractice claim, but also asserts claims arising

---

EMTALA claim occurred outside the peer review process." *Id.* at \*5. There has been no similar agreement here.

11

under EMTALA as well as several claims under 42 U.S.C. § 1983 and federal discrimination statutes.

Turning to the first consideration, whether the privilege serves private and public interests, Defendants argue that "[s]tate medical peer review statutes 'share a common purpose in encouraging [provider] candidates by eliminating the fear that peer review information can be used against them in subsequent litigation.'" [Doc. 97 p. 5 (quoting *K.D. ex rel. Dieffenbach v. United States*, 715 F. Supp. 2d 587, 594 (D. Del. 2010))]. Defendants contend "that the courts in this circuit place significant value on whether a state-law medical-malpractice claim is alleged when evaluating the application of privilege in the federal question context" [Doc. 97 p. 11 (citing *In re DOJ Subpoena*, 2004 WL 2905391, at *2; *Est. of McCleary*, 2025 WL 296142, at *4 (declining to apply the state law privilege where the case did not contain any assertions of state-law medical malpractice))].

Here, Plaintiff asserts a medical malpractice claim against Defendants Bannon, Fort Sanders Regional, and Covenant Health [Doc. 110 pp. 42–50]. Yet, this case is not a typical medical malpractice case. As previously detailed, in addition to the malpractice claim, Plaintiff asserts a claim arising under EMTALA as well as several claims under 42 U.S.C. § 1983 and federal discrimination statutes. Accordingly, this is not a straightforward evaluation of medical care in an isolated context. Indeed, the Complaint alleges that the Decedent presented to the emergency room, was removed by the hospital's security officers, was later arrested and detained by police officers, and then brought back to the emergency room after officers asked for an ambulance. Under these unique circumstances, the reports may include details that are relevant to Plaintiff's other claims, including his § 1983 claims. Because Decedent was removed from the medical care facility and taken into custody by law enforcement officials, the harm to the peer

review process as alleged by Defendants is outweighed by the benefit to Plaintiff and the public in ensuring that constitutional rights are protected, law enforcement officers are appropriately trained, and discrimination laws are not violated.

As to the second consideration—the evidentiary benefit that would result from the denial of the privilege—the Court finds that for the reasons just noted, even if Plaintiff could establish the medical malpractice claim without the disputed evidence, "the evidentiary benefit that would result from denying the privilege would aid Plaintiff in his § 1983 claim and his negligence claim wherein he alleges, among other things, that [Defendants Shield and Buckler Security, Inc., Fort Sanders Regional, Covenant Health, and the City of Knoxville] were negligent in their . . . supervisory [capacities]." *Hall v. Corr. Healthcare Cos.*, No. 1:17cv627, 2018 WL 3743877, at *2 (S.D. Ohio Aug. 7, 2018).

The Court recognizes that district courts within Tennessee have recognized a potential peer review privilege in federal question medical malpractice actions. *See In re DOJ Supboena*, 2004 WL 2905391, at *2 (distinguishing between applying a medical peer review privilege to a medical malpractice case and a fraud case); *Miller v. Uchendu*, No. 213CV02149, 2016 WL 11784214, at *5 (W.D. Tenn. Mar. 21, 2016) (applying the medical peer review privilege in a medical malpractice case against a doctor and a hospital). Defendants cite to *Miller* in support of their proposition that there is Sixth Circuit authority recognizing "the Tennessee QIC privilege satisfies [the *Jaffee* analysis] because certain private interests serve 'public ends' that are of 'transcendent importance'" [Doc. 97 p. 12 (citing *Miller*, 2016 WL 11784214, at *5)]. The Court notes, however, that the case at hand is readily distinguishable from *Miller*.[4] Specifically, the court in *Miller* found

---

[4] The Court further notes that in *Miller*, both parties seemingly consented to the privilege being applied; that is not the case here. *Miller*, 2016 WL 11784214, at *5 ("Moreover, here, both parties applied the privilege when briefing the merits of the motion to quash.").

13

"that all three of the *Jaffee* factors weigh in favor of recognizing the privilege here, particularly where there are no federal claims asserted against Dr. Uchendu." *Miller*, 2016 WL 11784214, at *5. Here, in contrast, there is a federal claim against the Defendants who are asserting the privilege, namely the EMTALA claim [Doc. 110 pp. 22–25].

Taking the *Jaffee* factors into consideration, on balance they weigh against the privilege. Further, "given that privileges are strongly disfavored in federal practice, the liberal view of discovery in the federal rules, and the lack of a historical or statutory basis for a medical peer review privilege under federal law, the court is disinclined to find that the federal common law supports the existence or application of a medical peer review privilege here." *Allen*, 2014 WL 434558, at *5 (citing *Univ. of Pa.*, 493 U.S. at 188–89).

Accordingly, any materials that are being withheld solely pursuant to Tenn. Code Ann. § 68-11-272(c) **MUST** be disclosed.

## B.       Attorney Client and Work Product Privileges

Plaintiff submits that "documents created in the ordinary course of care or compliance (i.e., incident reports, witness statements, and contemporaneous internal reviews) are not protected work product because they were not created 'because of' litigation" [Doc. 93 p. 18 (citing *United States v. Roxworthy*, 457 F.3d 590, 593–95 (6th Cir. 2006))]. Plaintiff contends that Defendants' "deficient privilege log does not establish that such privileges apply and/or whether they were waived" [*Id.*]. Plaintiff posits that the privilege log "must identify each withheld document (or redaction) on an item-by-item basis" and that "[i]t is not sufficient to log broad categories of documents (e.g., "witness notes," "witness summaries," or "investigative materials") without document level detail" [*Id.* at 20]. Plaintiff asserts that the privilege log "must provide a unique identifier/name/bates number, the date of its creation, author, all recipients (including copied

14

recipients) with titles/roles, type of document, length, a brief non-privileged description of the subject and purpose, and the specific basis for the asserted privilege/protection" [*Id.*].

Defendants respond and maintain that "the documents are the work product of an investigation directed by the Hospital's QIC and legal counsel" and that "[h]ospital counsel was immediately involved because of the clear and immediate prospect and anticipation of litigation" [Doc. 97 p. 3]. They explain that "[t]he Hospital's legal team was engaged on February 6, 2023, and assisted in directing the investigation from its inception immediately following the February 5, 2023, incident, as established by the Affidavit of Defense Counsel, Rick L. Powers, Esq." [*Id.* at 21 (citing Doc. 21-30)]. Defendants submit that "it is consistent with the policy of federal common law and [TSPQIA] that counsel would be involved in the investigatory process from the outset" [*Id.* at 21–22].

As for the privilege log, Defendants assert that it "provides the necessary factual basis to sustain the asserted protections" and that they "have provided sufficient information to enable the Plaintiff and the Court to assess the claim without revealing information itself privileged" [*Id.* at 22]. Defendants contend that Plaintiff's listed requirements for a what a privilege log must include "exceed[s] the scope of Rule 26 and would necessitate the disclosure of protected information" [*Id.*]. Finally, Defendants represent that "[t]o the extent that this Court determines that the TPSQIA statute or any equivalent privilege is not applicable to any document, Defendants will supplement the Privilege Log with particularized information to the extent those documents are privileged by other means than the TPSQIA, such as the attorney-client privilege or the work product doctrine" [*Id.* at 23].

In reply, Plaintiff propounds that "Rule 26(b)(5)(A) . . . requires the Defendants to 'expressly make the claim' [of privilege] at the time when they initially withheld the document"

15

and "does not permit the Defendants to keep asserting new privileges each time the Court overrules them" [Doc. 98 p. 1]. Before proceeding to *in camera* review, Plaintiff advances that "the Defendants should be required to serve a Privilege Log that identifies each document (not category of documents) being withheld, expressly identifies the privilege(s) being asserted as to that document, and provides a description sufficient to permit Plaintiff and the Court to evaluate the Defendants' claim of privilege" [*Id.* at 2].

As the Court has found the protections of TPSQIA do not apply, the Court need only evaluate the Privilege Log to the extent that Defendants claim materials are protected under the attorney-client privilege and work product doctrine.

The attorney-client privilege protects "confidential communications between a lawyer and his client in matters that relate to the legal interests of society and the client." *In re Grand Jury Subpoena*, 886 F.2d 135, 137 (6th Cir. 1989) (quoting *In re Grand Jury Investigation,* 723 F.2d 447, 451 (6th Cir. 1983)). "The privilege's primary purpose is to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of the law and the administration of justice.'" *Ross v. City of Memphis*, 423 F.3d 596, 600 (6th Cir. 2005) (quoting *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998)); *see also Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) ("The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer[]s being fully informed by the client.").

The elements of the attorney-client privilege are as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser (8) unless the protection is waived.

16

*Reed v. Baxter*, 134 F.3d 351, 355–56 (6th Cir. 1998) (citing *Fausek v. White*, 965 F.2d 126, 129 (6th Cir. 1992)). "The burden of establishing the existence of the privilege rests with the person asserting it." *Prudential Def. Sols. v. Graham*, 517 F. Supp. 3d 696, 702 (E.D. Mich. 2021) (quoting *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999)). "The privilege is 'narrowly construed because it reduces the amount of information discoverable during the course of a lawsuit.'" *Id.* (quoting *Ross*, 423 F.3d at 600).

As for work product, Federal Rule of Civil Procedure 26(b)(3) provides that a party may not discover "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3). "An attorney's work product is reflected in 'interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways . . . .'" *Gard v. Grand River Rubber & Plastics Co.*, No. 1:20-cv-125, 2021 WL 75655, at *11 (N.D. Ohio Jan. 8, 2021) (ellipses in original) (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)).

At issue here is Defendants claim of attorney-client privilege and the work-product doctrine in their Privilege Log, and whether the Privilege Log itself is sufficient. Rule 26 of the Federal Rules of Civil Procedure requires, in pertinent part, that a party seeking to avoid disclosure of privileged documents must "expressly make the claim" of privilege and must provide a privilege log setting forth "the nature of the documents, communications, or tangible things not produced or disclosed - and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A). A privilege log should contain sufficient information for the Court and Plaintiff to determine whether the documents at issue are properly subject to a privilege or protection. "The Court can reject the claim of privilege where the party invoking the privilege 'does not provide sufficient detail to

17

demonstrate fulfillment of all the legal requirements for application of the privilege.'" *Oddello Indus., LLC v. Sherwin-Williams Co.*, No. 2:14-CV-127, 2015 WL 13404598 (E.D. Tenn. May 22, 2015) (quoting *Bowne, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 474 (S.D.N.Y. 1993)).

Rule 26 does not delineate the precise information required in a privilege log, but the requirements have been described as "date, author and all recipients of the document, subject matter, and an explanation as to why the document should be privileged and not produced in discovery." *Clark Const. Grp., Inc. v. City of Memphis*, No. 01-2780, 2005 WL 6187896, at *3 (W.D. Tenn. Feb. 9, 2005) (quoting *Coltec Industries, Inc. v. Am. Motorists Ins. Co.*, 197 F.R.D. 368, 371 (N.D. Ill. 2000)). In *Clark Const. Grp.*, the court found the privilege log deficient because it used general categories of persons and entities without identifying anyone by name and position, and provided vague descriptions, such as a notation that a document is "correspondence" or "meeting notes" or "a report containing legal information." *Id.* The Court further notes that other courts in this circuit have required that "[f]or claims of attorney-work product, Defendant must also summarize whether the document contains mental impressions, conclusions, opinions or legal theories of an attorney or other representative of the party concerning the litigation." *Ypsilanti Comm. Utilities Auth. v. Meadwestvaco Air Sys. LLC*, 2009 WL 3614997 (E.D. Mich. Oct. 27, 2009) (citing Fed. R. Civ. P. 26(b)(3)(B)). As for documents Defendant claims to be "subject to attorney-client privilege, Defendant must identify the nature of the communication, identify the parties to the communication including carbon copies, by name, title and employer, identify the attorney(s) on the communication, the purpose of the communication and whether or not it sought and/or conveyed legal advice." *Id.*

If a party claims a privilege log is insufficient, courts have several potential courses of action: find the insufficient privilege log a waiver of privilege and compel disclosure of all

Case 3:24-cv-00039-CEA-DCP   Document 130   Filed 06/03/26   Page 18 of 20 PageID #: 1418

documents, conduct an *in camera* inspection of all or some of the documents, or allow supplementation of the privilege log. *See Grae v. Corrs. Corp. of Am.*, No. 3:16-cv-33667, 2020 WL 3035915, at *4–6 (W.D. Tenn. June 5, 2020) (explaining options and stating that where privilege log entries are insufficient to satisfy Rule 26, the court should compel production or require supplementation of privilege assertions); *Nozinich v. Johnson & Johnson, Inc.*, No. 09-2105-V, 2011 WL 13124088, at *3 (W.D. Tenn. Feb. 22, 2011) (ordering the defendant to supplement its privilege log in response to a motion to compel); *Blackwelder v. Specpub, Inc.*, No. 3:07-CV-486, 2009 WL 10710269, at *1 (E.D. Tenn. Apr. 30, 2009) (conducting an in camera review of documents where a privilege log was challenged as insufficient).

Upon reviewing Defendants' privilege log, as submitted by Plaintiff, the Court finds additional supplementation is warranted because it does not contain sufficient detail [*See* Doc. 93-3]. Given that, the Court **ORDERS** Defendants to supplement the privilege log consistent with Rule 26(b)(5)(A) of the Federal Rules of Civil Procedure and serve the supplement on Plaintiff on or before **June 17, 2026**.[5] The Court further **ORDERS** the parties to confer and file a joint status report on or before **June 24**, **2026**. The status report **SHALL** include a complete list of any remaining disputes related to the privilege log, including all information pertinent to the issue for the Court's review. For each disputed item, the report should explain each party's position on the issue.

## III.    CONCLUSION

Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion to Compel. Any materials that are being withheld solely pursuant to Tenn. Code Ann. § 68-11-272(c)

---

[5]      The Court notes that Defendants have raised TPSQIA as a privilege on various entries in their Privilege Log and make no other claims of privilege [*See* Doc. 93-3]. It is too late to do so now.

**MUST** be disclosed. Defendants **SHALL** supplement their Privilege Log on or before **June 17, 2026**, and the parties **SHALL** confer and file a joint status report on or before **June 24, 2026**.

    **IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
United States Magistrate Judge

20