**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| TIMOTHY T. BOYLAN, JR., | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. 3:24-cv-39 |
| | ) | |
| v. | ) | Judge Atchley |
| | ) | |
| BRANDON D. WARDLAW, *et al.*, | ) | Magistrate Judge Poplin |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Timothy T. Boylan, Jr.'s Motion to Disqualify the Counsel of Defendants Brandon D. Wardlaw, Adam Barnett, and Timothy Distasio [Doc. 153]. Specifically, Plaintiff asks this Court "to disqualify Lewis Thomason, P.C., and its attorneys, from jointly representing Defendants Brandon D. Wardlaw, Adam Barnett, and Timothy Distasio at trial." [*Id.* at 1]. In the alternative, Plaintiff seeks an order from this Court prohibiting Lewis Thomason, P.C., and its attorneys from "presenting any trial argument, witness examination, cross-examination, evidentiary theme, or defense theory that assigns responsibility, in whole or in part, from one jointly represented officer to another." [*Id.* at 2]. As the Court explains below, Wardlaw, Distasio, and Barnett have a unified theory of the case and make the same factual and legal assertions; therefore, there is no conflict of interest. Accordingly, Plaintiff's Motion [Doc. 153] is **DENIED.**

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Because the Parties are familiar with the details of this protracted dispute, the Court will keep this recitation of facts brief and limited to the scope of the Motion before it. On February 4, 2023, Lisa Edwards experienced abdominal pain on a flight to Tennessee. [Doc. 110 at ¶¶ 27, 31;

Doc. 127 at ¶ 27, 31]. That same evening, Edwards sought care at Fort Sanders Regional Emergency Department. [Doc. 110 at ¶ 33; Doc. 122 at ¶ 25]. The medical professionals at that hospital treated and discharged Edwards, [Doc. 122 at ¶ 28], but Edwards refused to leave. [Doc. 110 at ¶ 46]. Soon thereafter, Brandon Wardlaw, an officer of the Knoxville Police Department ("KPD"), arrived at the hospital in response to a request from the hospital to remove Edwards for trespassing. [Doc. 127 at ¶¶ 60, 62]. Wardlaw then arrested Edwards and requested a transport van for her. [Doc. 110 at ¶¶ 79, 81; Doc. 127 at ¶¶ 79, 81]. Later, KPD officer Adam Barnett and KPD civilian employee Danny Dugan arrived at the scene. [Doc. 110 at ¶ 80; Doc. 127 at ¶ 80].

By this time, Edwards allegedly was experiencing respiratory distress. [Doc. 110 at ¶ 98]. In his deposition testimony, Barnett explained that Dugan did not want to place Edwards in the transport van because doing so would have made it "harder for her to breathe." [Doc. 154-1 at 7]. Therefore, Barnett claims that he and Wardlaw decided to transport Edwards in a patrol car whose suspension was lower to the ground than that of the van. [*Id.* at 8–9]. Barnett and Wardlaw subsequently summoned Timothy Distasio, another KPD officer, to the scene and "sprung" that idea on him. [*Id.* at 9]. As Barnett and Distasio describe it, the KPD officers already at the scene loaded Edwards into Distasio's patrol car and told Distasio that he was tasked with transporting Edwards to jail. [*Id.;* Doc. 154-2 at 7]. Distasio then began transporting Edwards. [Doc. 110 at ¶ 137]. However, Distasio soon paused the transport to initiate a traffic stop. [Doc. 127 at ¶ 141]. After the conclusion of the traffic stop, Distasio checked in on Edwards and found her "very pale" and "unconscious." [Doc. 110 at ¶¶ 142, 143; Doc. 127 at ¶¶ 142, 143]. Distasio called an ambulance, which arrived and brought Edwards back to Fort Sanders Regional. [Doc. 110 at ¶¶ 146, 148; Doc. 127 at ¶¶ 146, 148]. Edwards shortly thereafter

suffered a stroke and a heart attack, leading to her death. [Doc. 110 at ¶¶ 148, 149; Doc. 127 at ¶ 148].

Plaintiff, the administrator of Edwards's estate, sued several entities and individuals—including the Officer Defendants—involved in the events described above. [*See* Doc. 1 (original complaint); Doc. 30 (first amended complaint); Doc. 110 (second amended complaint)]. After the conclusion of a lengthy multi-amendment pleading process and a prolonged discovery dispute, Plaintiff filed the Motion now before the Court. [Doc. 153]. Plaintiff argues that Lewis Thomason, P.C., and its attorneys cannot jointly represent the Officer Defendants because each officer has a defense against liability at their disposal that shifts blame to at least one of the other officers.[1] [*See* Doc. 154 at 7]. According to Plaintiff, Barnett and Wardlaw "may argue that their legally significant conduct ended before the fatal transport, as Edwards was then in Distasio's custody, and any failure to recognize or respond to medical deterioration occurred in Distasio's vehicle." [*Id.*]. On the other hand, Distasio can argue that he "reasonably relied on Wardlaw and Barnett, who had already assessed Edwards, approved the transport plan, selected his lower-profile vehicle, and treated her as medically safe for transport." [*Id.*]

By Plaintiff's lights, "[n]o lawyer can competently and diligently present both defenses" because attempting to do so would either result in "us[ing] Distasio's own testimony against him" or blaming Wardlaw and Barnett for "giving [Distasio] a person to transport who was not medically safe for transport. [*Id.*]. However, Plaintiff concedes that the Officer Defendants

---

[1] Plaintiff asserts that the risks posed by this blame shifting are enhanced by each officer's individual incentives to avoid punitive damages by blaming one another. [Doc. 154, at 9]. Plaintiff also warns of the prospect that any final judgment could be collaterally challenged because the Officer Defendants' conflicted counsel would be "unable to present individualized defenses, unable to pursue officer-specific arguments, or unable to assign responsibility to another officer." [*Id.* at 10]. However, because the Court finds that there is no conflict of interest here, it is unnecessary to address these (nonexistent) risks.

testified that "they personally did not intend to blame one another." [*Id.* at 5]. In fact, Wardlaw and Barnett both testified that they did not believe Distasio's acts or omissions led to Edwards's death. [Doc. 154-1 at 12; Doc. 154-3 at 15]. Similarly, Distasio disavowed plans to blame Wardlaw and Barnett for Edwards's death, which he believed to be a "tragic accident." [Doc. 154-2 at 22–23]. The Officer Defendants have responded to Plaintiff's motion [Doc. 153] by arguing that the conflict described by Plaintiff is only a hypothetical one and thus does not run the risk of materially limiting their attorneys' ability to defend them. [Doc. 161]. Thus, [Doc. 153] is ripe for this Court's review.

## II. STANDARD OF REVIEW

"The minimum standards of professional conduct before this Court include the Rules of Professional Conduct adopted by the Supreme Court of Tennessee." E.D. Tenn. Loc. R. 83.6. Rule 1.7 of the Tennessee Rules of Professional Conduct prohibits an attorney from representing two or more clients simultaneously if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client." Tenn. Sup. Ct. R. 8, RPC 1.7(a). In determining whether a lawyer's representation of one client materially limits his or her representation of another, courts should endeavor to answer the following "critical questions": "[W]hat is the likelihood that a difference in interests will eventuate and, if it does, will it materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client?" *Id.*, cmt. 8. This likelihood depends on the level of "discrepancy in the parties' testimony" and "incompatibility in positions in relation to an opposing party." *Id.*, cmt. 23.

"A motion to disqualify is the proper method for a party-litigant to bring an issue of conflict of interest or the breach of an ethical duty to the court's attention." *Hamrick v. Union Twp.*, 81 F. Supp. 2d 876, 878 (S.D. Ohio 2000). However, courts should tread carefully when deciding such motions, "as the ability to deny one's opponent the services of capable counsel is a potent weapon that can be misused as a technique of harassment." *Moses v. Sterling Commerce (Am.), Inc.*, 122 F. App'x 177, 183 (6th Cir. 2005) (cleaned up). To avoid this potential for abuse, "[a] court should only disqualify an attorney when there is a reasonable possibility that some specifically identifiable impropriety actually occurred." *Id.* at 183–84 (internal quotation marks omitted). "The decision whether to disqualify an attorney generally turns on the 'peculiar factual situation at hand.'" *Escordi v. Macomb Twp.*, 2022 WL 1599436, at *3 (E.D. Mich. May 20, 2022) (quoting *In re Mechem*, 880 F.2d 872, 874 (6th Cir. 1989)).

## III. ANALYSIS

To this Court's knowledge, no other Tennessee court has confronted the issue of whether an attorney is materially limited by representing two defendant-officers in the same § 1983 case. Therefore, "the Court will rely on the principles set forth in Rule 1.7(a) and will look to how other [jurisdictions'] courts have applied such principles in similar cases." *Adkisson v. Jacobs Eng'g Grp., Inc.*, 2016 WL 6534273, *3 (E.D. Tenn. Nov. 1, 2016). And indeed, many courts outside of Tennessee have encountered the question of whether a material conflict exists when an attorney in a § 1983 case defends both an officer and either (1) another officer or (2) the municipality employing the officer. *See, e.g.*, *In re Petition for Rev. of Op. 552 of Advisory Comm. on Prof. Ethics*, 507 A.2d 233 (N.J. 1986); *Dunton v. Cnty. of Suffolk*, 729 F.2d 903, 907 (2d Cir. 1984), *amended on other grounds by* 748 F.2d 69 (2d Cir. 1984); *Galloway v. Nassau Cnty.*, 569 F. Supp. 3d 143, 148–49 (E.D.N.Y. 2021).

It is first worth noting here that "[t]here is always the *potential* for conflict in multiple representation cases." *Clay v. Doherty*, 608 F. Supp. 295, 303 (N.D. Ill. 1985). However, such "potential is insufficient to compel withdrawal or disqualification." *Id.* (citing *Kerry Coal Co. v. United Mine Workers of Am.*, 470 F. Supp. 1032, 1036 (W.D. Pa. 1979)). As the U.S. District Court for the Western District of Pennsylvania once put it:

> Nearly every case, criminal or civil, which involves more than one defendant presents the opportunity to each defendant to attempt to exculpate himself from liability or guilt by blaming any wrongdoing on the other defendant. But even where this possibility is especially apparent because of the differing circumstances of the defendants' involvement, courts have not necessarily held joint representation improper.

*Kerry*, 470 F. Supp. at 1036.

The central question, then, is this: What makes a potential for material conflict germinate into an actual material conflict? Or, to cast this inquiry in the words of the commentary to Rule 1.7(a), when does "the likelihood that a difference in interests will eventuate" become unacceptably high? Tenn. Sup. Ct. R. 8, RPC 1.7, cmt. 8.

As the Court explains below, the case law on material conflicts in § 1983 claims suggests that an actual material conflict exists when one client makes factual claims or legal arguments that, *ipso facto*, impair the attorney's ability to defend the legal interests of another client. *Contrast Dunton*, 729 F.2d at 907–08 (concluding that a conflict existed in a § 1983 action where the county attorney representing an officer and his employer argued that the officer's actions were outside of the scope of his duty), *with Pierce v. Town of Golden Meadow*, 2026 WL 1282831, at *6–8 (E.D. La. May 11, 2026) (finding no material limitation where the municipality and the individual defendants asserted a unified defense through one attorney). And here, none of the Officer Defendants has made any factual representations or legal arguments that elevate the

potential for material conflict into an actual material conflict. [Doc. 154-1 at 12; Doc. 154-3 at 15; Doc. 154-2 at 22–23].

**a. In a § 1983 case involving the joint representation of multiple defendants, an actual material conflict exists when one client makes factual claims or legal arguments that, *ipso facto*, impair the attorney's ability to pursue another client's preferred defense.**

Of any case addressing material conflicts in § 1983 claims, one is cited far more than any others: *Dunton v. County of Suffolk*, 729 F.2d 903, 907 (2d Cir. 1984). In *Dunton*, the plaintiff made sexual advances towards his coworker while sitting in the coworker's car. *Id.* at 905. The coworker's husband, a Suffolk County policeman, "came upon the scene in his patrol car," removed the plaintiff from the coworker's car, and injured the plaintiff by physically striking him. *Id.* The plaintiff then filed a § 1983 action against both the policeman and Suffolk County. *Id.* at 906. In a post-trial motion, the policeman argued that the County Attorney, who represented both him and county, should have been disqualified because of a material conflict. *Id.* at 907. Specifically, the policeman argued that his good faith immunity defense was undermined by the attorney because he repeatedly represented to the court that the policeman had "acted not as a police officer, but as an 'irate husband.'" *Id.*

As the U.S. Court of Appeals for the Second Circuit explained, "A municipality may avoid [§ 1983] liability by showing that the employee was *not* acting within the scope of his official duties," while an employee "may partially or completely avoid liability by showing that he *was* acting within the scope of his official duties." *Id.* (emphasis added). Thus, the attorney's attempt to pursue the municipality's interest by arguing that the policeman was acting outside of the scope of his duties nullified the attorney's ability to pursue the policeman's preferred legal defense. *Id.* In fact, the Second Circuit explained that the "conflict surfaced when the County Attorney stated that [the policeman] was not acting under color of state law but rather as an 'irate

husband.'" *Id.* This observation signals that the potential for a material limitation becomes an actual limitation only when one client makes a factual or legal contention to the court that contravenes another client's material interest. *See id*; *see also In re Petition for Rev. of Op. 552 of Advisory Comm. on Prof. Ethics*, 507 A.2d 233, 239 (N.J. 1986) (concluding that "joint representation will be permissible if it does not appear clearly from the pleadings or from early discovery that the claims against the governmental entity and its individual employees will result in different and inconsistent defenses").

*Clay v. Doherty*, decided a year after *Dunton*, offers a paradigmatic example of how the potential for material conflict in a § 1983 case may remain dormant and never actualize. *See* 608 F. Supp. 295, 303 (N.D. Ill. 1985). In *Clay*, the plaintiff filed § 1983 claims against a litany of different defendants, including Cook County and the supervisors at its public defender's office, because the plaintiff had been incompetently represented in a juvenile criminal proceeding. *Id.* at 297. The plaintiff argued the attorney representing both the supervisors and Cook County was materially conflicted because his clients had incompatible incentives: According to the plaintiff, one supervisor could avoid liability by blaming the other supervisor for the incompetent representation, or both supervisors could simply blame the County for inadequately funding the public defender's office. *Id.* at 301. The defendants conceded that these conflicts would "warrant withdrawal *if they were actual*," but denied that there was "any indication (let alone any evidence) . . . that those conflicts [would] ever materialize in such a way as to trigger the prohibitions embodied" in the relevant rule of professional conduct. *Id.* at 303.

The *Clay* Court rejected the plaintiff's arguments because none of the potential conflicts she had described "ha[d] emerged in any concrete form." *Id.* Each of the two supervisors claimed at deposition that the responsibility of "dealing with charges of inadequate representation" rested

with others, including the other supervisor. *Id.* The Court acknowledged that these differing accounts had the potential to "give rise to real conflicts." *Id.* Still, the Court continued, that "potential ha[d] yet to be realized" because the plaintiff could not point to any evidence explaining how the supervisors' differing opinions necessarily portended inconsistent defenses. *Id.* Consequently, the Court denied plaintiff's disqualification motion and added that granting the motion would have inappropriately stripped the defendants of the ability to "choose their own theory of the case." *Id.* at 303–04.

Juxtaposing *Dunton* and *Clay* reveals that, although there is always a latent potential for material conflict when an attorney represents multiple defendants in a § 1983 case, a catalyst is needed to realize that potential. In *Clay*, the defendants possessed conflicting potential defenses but made no factual assertions or legal theories evincing an intent to pursue those theories. *See id.* at 303–04. On the other hand, in *Dunton*, the municipality made a factual representation to the court that was plainly inconsistent with the policeman's asserted good faith immunity defense. 729 F.2d at 906. The outcome of both cases revolves around the absence or presence of a representation to the court that is factually or legally incompatible with another client's preferred defense. *This* kind of representation to the court is the catalyst that makes the "likelihood that a difference in interests will eventuate" become unacceptably high. Tenn. Sup. Ct. R. 8, RPC 1.7, cmt. 8. Therefore, if Plaintiff can point the Court to where such a catalyst may be found in this case, then there is a material limitation. However, as explained below, Plaintiff does not do so.

**b. Because none of the Officer Defendants has made any factual representations or legal arguments that would impair their attorneys' ability to defend any of the other Officer Defendants, their attorneys are not materially limited under Rule 1.7(a).**

Plaintiff contends that Barnett and Wardlaw can attribute Edwards's injury to Distasio's transport of Edwards, while Distasio can maintain he relied on Barnett and Wardlaw's

representations that Edwards was safe to transport. [*See* Doc. 154, at 7]. The Court acknowledges that this scenario certainly "presents the *opportunity*" for each of the Officer Defendants to avoid "liability or guilt by blaming any wrongdoing on" another of the Officer Defendants. *Kerry Coal Co. v. United Mine Workers of Am.*, 470 F. Supp. 1032, 1036 (W.D. Pa. 1979) (emphasis added). But an opportunity is just that: an *opportunity*. Plaintiff must point to a time where at least one of the Officer Defendants capitalized on that opportunity by making a factual or legal argument that jeopardizes their attorney's ability to represent the other Officer Defendants. But Plaintiff fails to do this.

Unlike in *Dunton*, where the municipality attempted to escape liability by making a claim manifestly incompatible with the policeman's asserted good faith immunity defense, the Officer Defendants do not attempt to escape liability by pointing the finger at one another. *See* 729 F.2d at 906. In fact, when Plaintiff's counsel specifically asked each of the Officer Defendants during their depositions whether they planned to blame the other officers, each defendant answered in the negative. Both Wardlaw and Barnett opined that Distasio's acts or omissions did not lead to Edwards's death. [Doc. 154-1 at 12; Doc. 154-3 at 15]. Likewise, Distasio specifically renounced any plans to blame Wardlaw and Barnett for Edwards's death and further suggested that neither of the two was at fault by labelling Edwards's death as a "tragic accident." [Doc. 154-2 at 22–23].

Plaintiff further claims that the Officer Defendants cannot simply clean their hands of a conflict by promising not to blame one another since "[a] conflict also may exist in litigation because of a 'substantial discrepancy in the parties' testimony' or 'incompatibility in positions in relation to an opposing party.'" [Doc. 154, at 8 (quoting Tenn. Sup. Ct. R. 8, RPC 1.7 cmt. 23)]. As the *Clay* Court did, this Court acknowledges that "differing accounts could, of course, give

rise to real conflicts." *Clay v. Doherty*, 608 F. Supp. 295, 303 (N.D. Ill. 1985). In *Clay*, the differences in the supervisors' testimony that the plaintiff highlighted did not, at the time, give rise to any conflict. *Id.* But here, there are not even any differences in the Officer Defendants' pleadings or testimony upon which a conflict may be based. Since all the Officer Defendants here submitted the exact same answer in this case, they have made the exact same factual admissions, factual denials, and legal arguments. [*See generally* Doc. 127]. Also, in their depositions, all three Officer Defendants told largely the same story: Wardlaw and Barnett decided how to transport Edwards, and then Distasio was summoned and tasked with transporting Edwards in his patrol car. [*Compare* Doc. 154-3, *with* Doc. 154-1, *and* Doc. 154-2]. Consequently, the Officer Defendants' attorneys actually face *less* risk of a material conflict than the supervisors' attorneys did in *Clay*. *See* 608 F. Supp. at 303.

In short, each of "the police officers make[s] common cause against [P]laintiff on the merits" insofar as all Officer Defendants deny that any of them violated a duty of care that they owed towards Edwards. *Smith v. City of New York*, 611 F. Supp. 1080, 1089 (S.D.N.Y. 1985); [*see* Doc. 127, at ¶¶ 354, 356 (denying that any of the Officer Defendants caused Edwards's death and alleging that all Officer Defendants behaved reasonably and in good faith)]. Unless that changes any time soon—and it appears it will not—this Court has no reason to conclude that the mere *possibility* of conflict attendant to every instance of joint representation has matured into an *actual* conflict cognizable under Tennessee Rule of Professional Conduct 1.7(a).

## IV. CONCLUSION

"Loyalty and independent judgment are essential elements in the lawyer's relationship to a client." Tenn. Sup. Ct. R. 8, RPC 1.7 cmt. 1. Consequently, this Court will remain vigilant of any conflict of interest that might compromise an attorney's ability to zealously advocate for his

or her client, and it is satisfied that no such conflict exists here. But this Court is also aware of the fact that the vehicle for policing those conflicts, the motion to disqualify, is susceptible to "misuse[] as a technique of harassment." *Kitchen v. Aristech Chem*., 769 F. Supp. 254, 257 (S.D. Ohio 1991) (citation omitted). Such misuse of the motion to disqualify "promote[s] intense professional and personal bitterness." Steven H. Goldberg, *The Former Client's Disqualification Gambit: A Bad Move in Pursuit of an Ethical Anomaly*, 72 Minn. L. Rev. 227, 262 (1987). "Our adversary system . . . gains little from what appears as petty professional squabbling" to the society it aims to serve. *Id.*

This Court cannot draw any firm conclusions about the extent of the animosity between the counsel in this protracted case, but the Court has its suspicions. Plaintiff filed his motion to disqualify [Doc. 153] a full four months after Plaintiff's counsel notified the Officer Defendants' counsel of the alleged conflict, [*see* Doc. 154-4], and less than a month after Plaintiff filed a motion to exclude the testimony of the Officer Defendants' expert witness (a motion to which a response was required by the Officer Defendants' counsel). [*See* Doc. 133].

So, for the foregoing reasons, the Plaintiff's Motion to Disqualify Counsel [Doc. 153] is **DENIED**. The Parties and their counsel are **REMINDED** that the Court expects them to exhibit good faith and professionalism in all interactions with each other and the Court.

**SO ORDERED**.

*<u>/s/ Charles E. Atchley, Jr.</u>*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**